[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Link v. FirstEnergy Corp.*, Slip Opinion No. 2016-Ohio-5083.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-5083

LINK ET AL., APPELLEES, *v.* FIRSTENERGY CORPORATION; CLEVELAND ELECTRIC ILLUMINATING COMPANY ET AL., APPELLANTS.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Link v. FirstEnergy Corp.*, Slip Opinion No. 2016-Ohio-5083.]**

*Public utilities—Use of township right-of-way—No provision of Ohio law required public utilities to obtain permission from township and county engineer to leave utility pole in existing location following road-widening project—Evidence at trial was not legally sufficient to establish that pole interfered with usual and ordinary course of travel—Court of appeals' judgment affirming jury award in favor of motorcyclist reversed.*

(No. 2015-0132—Submitted February 23, 2016—Decided July 26, 2016.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 101286, 2014-Ohio-5432.

_____

**FRENCH, J.**

{¶ 1} In this appeal, we address whether defendants-appellants, the Cleveland Electric Illuminating Company ("CEI") and FirstEnergy Service Company ("FirstEnergy"), may be held liable for injuries sustained by plaintiff-appellee Douglas V. Link resulting from a motorcycle accident involving a CEI utility pole. For the reasons below, we reverse the judgment of the Eighth District Court of Appeals, which affirmed a jury award in favor of Douglas Link and his wife, plaintiff-appellee Diane Link, and we remand the matter to the trial court to enter judgment for defendants-appellants.

## FACTS AND PROCEDURAL HISTORY

### *The Savage Road project*

{¶ 2} On May 8, 2006, the Bainbridge Township Board of Trustees passed a resolution to improve and widen Savage Road in Bainbridge Township, Geauga County, Ohio. In accordance with R.C. 5573.01, the resolution authorized the Geauga County Engineer's Office to prepare engineering plans as well as any required surveys, estimates, and specifications. By statute, the county engineer supervises the construction, reconstruction, and improvement of public roads undertaken by boards of township trustees under R.C. 5573.01. R.C. 5543.09(A). On June 23, 2008, the board passed another resolution, adopting the county engineer's plans and authorizing the township to begin the contractor-bidding process. Work on the Savage Road project began sometime in the fall of 2008.

{¶ 3} In September 2008, the county engineer transmitted the Savage Road construction plans to CEI. Later that month, CEI confirmed receipt of the construction plans and acknowledged the presence of utility poles along Savage Road that required relocation. In October 2008, CEI submitted to the county engineer its plan to relocate approximately 37 utility poles. The county engineer did not send any formal approval of CEI's October 2008 plan but presumed that CEI would proceed with pole relocation in accordance with the plan.

**{¶ 4}** On March 2, 2009, the county engineer received a revised plan from CEI. CEI's revised plan reduced the number of pole relocations and divided the work into two phases. The first phase prioritized the removal of 15 poles. The second phase called for the later removal of 9 poles on the west side of Savage Road. By June 2009, however, CEI had decided not to move 8 of the 9 poles designated for the second phase.

**{¶ 5}** In a letter dated March 26, 2009, the county engineer wrote to FirstEnergy's external affairs division, which served as the liaison between CEI and governmental entities. In his letter, the county engineer expressed concerns that CEI's revised plan "[did] not address the clear zone of the roadway," exposed some poles in the ditch line, and left other poles "in front of the ditch * * * only four to six feet off the edge of the pavement." The letter further stated:

> I would think this is a liability FirstEnergy does not want to absorb and I know this is a liability the township will not allow to exist on a public road.
>
> As Project Manager for the township road reconstruction project, I am requesting your review of this project with the hope you will agree that it is in the best interest of everyone that First Energy completes the October 2008 plan in a timely fashion and provide[s] a safe, clear zone for the roadway.

FirstEnergy did not respond to the letter.

**{¶ 6}** By June 2009, the roadwork contractor had completed its work on the Savage Road project and submitted final invoices to the township. After consulting with the offices of the county prosecutor and the county engineer, the Bainbridge Township Board of Trustees decided on June 22, 2009, to reopen Savage Road, even though the disputed poles had not been moved.

**{¶ 7}** One year later, the chairman of the Bainbridge Township Board of Trustees sent a letter dated June 24, 2010, to FirstEnergy, again requesting relocation of the eight disputed poles. In September 2010, FirstEnergy's director of external affairs responded with a letter explaining that CEI had decided not to relocate the remaining eight poles after determining that "there was no potential conflict with drainage ditches or other governmental functions." FirstEnergy's letter also stated that CEI "does not relocate poles for clear zone, except at the customer's expense." The township did not respond to the letter or initiate any formal proceedings requiring CEI to remove the poles.

### The Link accident and lawsuit against CEI and FirstEnergy

**{¶ 8}** On the night of October 8, 2010, Douglas Link ("Link") was driving his motorcycle on Savage Road when a deer struck Link on his left side. Diane Link, who was driving behind her husband in her car, saw the deer leap up from the left side of the road but did not see the moment of impact. When she no longer saw the headlights of Link's motorcycle in front of her, she pulled over, found Link lying on the side of the road, and called 9-1-1. Link sustained extensive, long-term injuries to his right leg and pelvis.

**{¶ 9}** The Links sued CEI, FirstEnergy, and their parent company, FirstEnergy Corporation (collectively, "defendants"), alleging that Link struck one of the eight utility poles that defendants had failed to relocate and that Link's impact with the pole was the direct and proximate cause of his injuries. The Links asserted claims for negligence, negligence per se, absolute and/or qualified nuisance, loss of consortium, and punitive damages.

**{¶ 10}** Defendants filed two motions for summary judgment, arguing that under *Turner v. Ohio Bell Tel. Co*., 118 Ohio St.3d 215, 2008-Ohio-2010, 887 N.E.2d 1158, a utility company cannot be held liable when a vehicle collides with one of its poles located off the improved roadway if the utility company had obtained the required permission to install the pole and the pole does not interfere

with the usual and ordinary course of travel. The CEI pole involved in Link's accident was originally erected in 1952 and replaced in 1975. CEI argued that no further permission was necessary when the pole had been in the same position for decades. The court denied both motions, and the case proceeded to a jury trial.

{¶ 11} The parties do not dispute that Link's motorcycle hit a CEI utility pole at some point after the deer struck Link. The parties offered conflicting evidence, however, as to whether Link was still riding his motorcycle when it hit the pole. An accident reconstructionist who testified for the Links opined that Link was still riding his motorcycle and attempting to return to the road when he collided with the pole. The Links argued that if CEI had moved the pole in accordance with its original plan, Link would have been able to avoid the pole. Defendants' accident reconstructionist opined that Link more likely fell off his motorcycle before it struck the pole and that the pole therefore did not cause Link's injuries.

{¶ 12} CEI's original, October 2008 plan called for relocation of the pole 43 feet to the south and 9 feet to the west, providing a 17-foot clear zone. A "clear zone" is an unobstructed area of the right-of-way[1] beyond the pavement edge where an errant vehicle leaving the paved road can come to a stop or return safely to the pavement. For an uncurbed township or county road like Savage Road with a speed limit of 45 m.p.h. and average daily traffic of 2,200 vehicles, the Ohio Department of Transportation's ("ODOT") Location and Design Manual recommends a clear zone of 17 feet. CEI's design-and-construction manual incorporates ODOT's clear-zone standards. After completion of the road-improvement project, the pole was 6 feet, 3.6 inches from the pavement edge, 8

---

[1] "Right-of-way" is defined as a "general term denoting land, property, or the interest therein * * * acquired for or devoted to transportation purposes" and "includes the roadway, shoulders or berm, ditch, and slopes extending to the right-of-way limits under the control of the state or local authority." R.C. 4511.01(UU)(2).

feet, 2.4 inches from the outside edge of the white line, and 8 feet, 7.2 inches from the inside edge of the white line.

{¶ 13} CEI acknowledged that the pole did not meet the recommended 17-foot clear-zone standard. However, CEI's original plan left four poles in the clear zone, and the county engineer did not object to that plan. The county engineer's office did not require the removal of other obstructions, such as mailboxes and driveway drainage pipes, located four to six feet from the pavement. It requires utilities to obtain a permit only for pipelines and other underground structures but does not require a permit for utility-pole installation or relocation.

{¶ 14} Defendants presented evidence that the relevant manuals setting out clear-zone standards leave room for engineering discretion. ODOT states that its Location and Design Manual "should be used as a guide for establishing clear zones for various types of highways and operating conditions" and that "full consideration[ ] shall be given to sound engineering principles and economic factors." The Geauga County Commissioners Highway Use Manual states that its "guidelines for accommodation of power and communication lines on highway rights-of-way will vary with the site conditions" and that they should be "considered a flexible policy which may be modified where special conditions exist."

{¶ 15} Defendants also presented testimony explaining that CEI designates a pole for mandatory relocation on road-widening projects if the pole will end up in the improved drainage ditch or in the improved pavement or if earth removal results in grade cuts that compromise the pole's stability in the ground. The eight poles that CEI decided not to move, including the one involved in Link's accident, did not meet any of these conditions.

{¶ 16} At the close of their case, the Links dismissed their negligence-per-se claim. The trial court directed a verdict for FirstEnergy Corporation as to all claims based on insufficient evidence of its involvement. The court also directed

a verdict for defendants on the absolute-nuisance claim. At the close of defendants' case, the court granted defendants' renewed motion for directed verdict on the claim for punitive damages.

{¶ 17} With respect to the three remaining claims against CEI and FirstEnergy, the jury returned a verdict for the Links on their qualified-nuisance and loss-of-consortium claims but returned a verdict for CEI and FirstEnergy on the negligence claim. The jury awarded $237,200 for Douglas Link's past economic loss, $180,982 for his future economic loss, and $234,100 for his future noneconomic loss. But the jury did not award past noneconomic damages. The jury awarded $146,250 for Diane Link's loss-of-consortium claim. In response to interrogatories, the jury apportioned the parties' shares of liability as follows: CEI 27 percent, the county engineer's office 22 percent, FirstEnergy 19 percent, Douglas Link 17 percent, and Bainbridge Township 15 percent. The trial court reduced the amount of damages awarded to the Links accordingly.

{¶ 18} On February 21, 2013, CEI and FirstEnergy filed a motion for judgment notwithstanding the verdict ("JNOV"), renewing the argument made in their motions for summary judgment that *Turner*, 118 Ohio St.3d 215, 2008-Ohio-2010, 887 N.E.2d 1158, provided an absolute bar to liability. The trial court denied the motion.

### *The appeal*

{¶ 19} CEI and FirstEnergy appealed to the Eighth District Court of Appeals and collectively asserted five assignments of error. The Links also filed a cross-appeal asserting four cross-assignments of error. CEI's first assignment of error is the only one relevant to the appeal before us.

{¶ 20} CEI argued that the trial court erred in denying summary judgment, a directed verdict, or JNOV on the qualified-nuisance claim, because *Turner* insulated them from liability. The Eighth District disagreed and held that "CEI cannot rely on *Turner* as a shield from liability." 2014-Ohio-5432, 25 N.E.3d

1095, ¶ 24. The court concluded that "CEI did not have the requisite permission to keep the Pole in its original location after completion of the Savage Road widening project." *Id.* The court also held that the trial court erred in granting defendants' motion for directed verdict on the punitive-damages claim and remanded the cause to the trial court to conduct a new trial solely on the issue of punitive damages with CEI and FirstEnergy as the only defendants. *Id.* at ¶ 47, 54.

### *Question presented*

{¶ 21} We accepted CEI and FirstEnergy's appeal on their first proposition of law: "The statutory permission granted to utilities by R.C. 4931.03 to maintain poles in the unincorporated area of an Ohio township satisfies the 'any necessary permission' requirement of *Turner* absent legislative action by a governing public authority to revoke or cancel the statutory permission." *See* 143 Ohio St.3d 1440, 2015-Ohio-3427, 36 N.E.3d 188. We rejected CEI and FirstEnergy's second proposition of law, in which they asserted error by the appeals court in granting a new hearing for punitive damages. *Id.* We also declined to accept the Links' cross-appeal arguing plain error by the jury in failing to award damages for past noneconomic loss. *Id.*

### ANALYSIS

### *Standard of review*

{¶ 22} The trial court's denial of JNOV raises a question of law requiring de novo review as to whether the evidence, construed most strongly in favor of appellees, is legally sufficient to sustain the jury's verdict. *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 23. While the trial court also denied appellants' two motions for summary judgment that were based on *Turner*, the subsequent jury verdict in the Links' favor rendered the denial of summary judgment moot. *See Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150, 642 N.E.2d 615 (1994),

8

syllabus ("Any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made").  We therefore limit our review here to whether the trial court erred in denying appellants' motion for JNOV.

### Legal framework for utility use of public rights-of-way

{¶ 23} Since 1847, public utility companies in Ohio have enjoyed a qualified right to place utility poles within the right-of-way of public roads. *Turner*, 118 Ohio St.3d 215, 2008-Ohio-2010, 887 N.E.2d 1158, at ¶ 7, citing 45 Ohio Laws 34.  But "utility companies do not enjoy unfettered discretion in the placement of their poles within the right-of-way" and "are required to obtain approval from the owner of the right-of-way." *Id.* at ¶ 20.  R.C. 4931.03 governs utilities' use of the public right-of-way in the unincorporated area of a township.

{¶ 24} In *Turner*, we held that "[w]hen a vehicle collides with a utility pole located off the improved portion of the roadway but within the right-of-way, a public utility is not liable, as a matter of law, if the utility has obtained any necessary permission to install the pole and the pole does not interfere with the usual and ordinary course of travel." *Id.* at syllabus.  "Placement that complies with the requirements of the public authority that owns the right of way is indicative that the object is not an obstacle to the traveling public." *Id*. at ¶ 20.

{¶ 25} Applying the framework set out in *Turner*, we conclude that no provision of Ohio law required CEI and FirstEnergy to obtain permission from the appropriate public authorities—here, the township and county engineer—to leave the pole involved in Link's accident in its existing location.  We also conclude that the evidence at trial, even when construed most strongly in the Links' favor, was not legally sufficient to establish that the pole interfered with the usual and ordinary course of travel.

*Permission to maintain utility poles in township right-of-way*

{¶ 26} With respect to a public right-of-way located in an unincorporated area of a township, R.C. 4931.03 states that a utility company[2] may "[c]onstruct telecommunications lines or facilities upon and along any of the public roads and highways and across any waters within that area by the erection of the necessary fixtures, including posts, piers, or abutments for sustaining the cords or wires of those lines or facilities."  R.C. 4931.03(A)(1).

{¶ 27} R.C. 4931.03 imposes two applicable limitations on a utility company's use of a township right-of-way.  "Th[e] lines and facilities shall be constructed so as not to incommode the public in the use of the roads or highways * * *."  R.C. 4931.03(A)(1).  And "[c]onstruction under this section is subject to section 5571.16[3] of the Revised Code, as applicable, and any other applicable law, including, but not limited to, any law requiring approval of the legislative authority, the county engineer, or the director of transportation."  R.C. 4931.03(B)(2).

{¶ 28} We conclude based on the record before us that CEI and FirstEnergy complied with all "applicable law" governing the placement of the utility pole involved in Link's accident and that they were not required to obtain a permit or approval from the township board of trustees or county engineer to leave the pole in its existing location.  Absent a resolution or affirmative legal action from the Bainbridge Township Board of Trustees seeking to revoke permission, no "applicable law" required CEI and FirstEnergy to move the pole from its current location.

{¶ 29} While the county engineer has supervisory authority over road-improvement projects undertaken by the boards of township trustees, there is no

---

2  R.C. 4931.03 applies to telecommunications and electric companies. *See* R.C. 4933.14(A).
3  R.C. 5571.16 pertains to the installation of new utility poles in a township right-of-way and is therefore not relevant to this appeal.

provision of Ohio law "requiring approval of * * * the county engineer" with respect to the placement of utility poles on township roads. R.C. 4931.03(B)(2). R.C. 5543.09(A) states that "the county engineer shall supervise * * * the construction, reconstruction, resurfacing, and improvement of public roads by boards of township trustees." However, the Links cannot point to a statute requiring utility companies to obtain a permit or approval from the county engineer before installing or relocating utility poles on township roads. In contrast, the statutes governing the use of a public right-of-way belonging to the state or a municipality require the issuance of a permit by the appropriate authority. *See* R.C. 5515.01 (upon formal application, director of transportation may grant a permit "with respect to the location of poles" on state highways subject to the conditions set forth in divisions (A) through (H)); R.C. 4939.03(C)(1) ("No person shall occupy or use a public way without first obtaining any requisite consent of the municipal corporation owning or controlling the public way").

{¶ 30} The Eighth District relied on the county engineer's March 26, 2009 letter to conclude that CEI did not have permission to keep the pole involved in Link's accident in its existing location. 2014-Ohio-5432, 25 N.E.3d 1095, at ¶ 21-24. The letter expressed disapproval of CEI's revised plan and requested "review of this project with the hope * * * that First Energy completes the October 2008 plan in a timely fashion and provide[s] a safe, clear zone for the roadway." However, a letter expressing disapproval does not carry the force of law requiring CEI to move its utility poles. Indeed, the county engineer acknowledged that he did not have authority to order the relocation of utility poles. While the Geauga County Commissioners Highway Use Manual requires utilities to obtain a permit for underground installations and pipelines, it does not require a permit for utility-pole installation or relocation.

**{¶ 31}** The Links also cannot point to any "other applicable law" requiring CEI and FirstEnergy to obtain approval from the township's legislative authority, here the Bainbridge Township Board of Trustees, to leave the pole in its existing location. While the board's chairman sent a letter to FirstEnergy dated June 24, 2010, requesting relocation of the eight disputed poles, a letter, without more, does not have the force of law.

**{¶ 32}** The Links would have a better argument if the board had taken affirmative steps to order the removal or relocation of the utility pole. R.C. 5571.14 authorizes a board of township trustees or township highway superintendent to declare as a public nuisance an object bounding a township road that "obstructs or endangers the public travel" and to order its removal within 30 days. R.C. 5571.14(A). Upon refusal to comply, the board or superintendent can order the object's removal and certify the expense to the county auditor to be collected in the same manner as a tax. *Id. See also Toledo Edison Co. v. Bd. of Defiance Cty. Commrs.*, 2013-Ohio-5374, 4 N.E.3d 458 (3d Dist.) (board of county commissioners may order removal of utility poles along county right-of-way pursuant to resolution under R.C. 5547.03).

**{¶ 33}** Instead of initiating legal proceedings requiring CEI and FirstEnergy to move their utility poles, however, the board decided to reopen Savage Road after consulting with the county prosecutor and county engineer. The board evaluated the risk to public safety and decided as the owner of the right-of-way that the existing placement of CEI's utility poles would not incommode the public use of Savage Road. Accordingly, the jury found that the tortious conduct of both the county engineer's office and the board contributed to Link's injuries. Absent a resolution or other affirmative legal action from the board, no provision of Ohio law required CEI and FirstEnergy to move the involved pole or to obtain a permit to leave the pole involved in Link's accident in

its existing location. We therefore conclude that CEI and FirstEnergy satisfied the first prong of *Turner*.

### Evidence that the pole did not "interfere with the usual and ordinary course of travel"

{¶ 34} Turning to the second prong of the *Turner* test, we also conclude that the evidence at trial was not legally sufficient to establish that the CEI utility pole involved in Link's accident interfered with the usual and ordinary course of travel on Savage Road. A utility company can be held liable when its placement of an object "that is not on the improved portion of the road but within the right-of-way is a condition that makes the roadway unsafe for the *usual and ordinary course of travel*." (Emphasis sic.) *Turner*, 118 Ohio St.3d 215, 2008-Ohio-2010, 887 N.E.2d 1158, at ¶ 22, citing *Manufacturer's Natl. Bank of Detroit v. Erie Cty. Rd. Comm.*, 63 Ohio St.3d 318, 322, 587 N.E.2d 819 (1992). In *Turner*, a motorist veered off a state highway due to darkness and fog and collided with a utility pole located in a grassy area two feet, five inches from the berm and three feet, nine inches from the white line at the edge of the road. *Id*. at ¶ 1. We held that the pole did not interfere with the ordinarily and usually traversed portion of the road and that a motorist properly using the improved portion of the highway would not have come into contact with the utility pole. *Id.* at ¶ 24.

{¶ 35} Even when construing the evidence most strongly in the Links' favor, as we must, and assuming that Link struck the utility pole while still on his motorcycle, there was no evidence that the pole's placement created an unsafe condition for normal travel. Had Link stayed within the marked lanes or even on the improved portion of the roadway, his motorcycle would not have come in contact with the pole.

{¶ 36} After completion of the road-improvement project, the pole measured 6 feet, 3.6 inches from the pavement edge, 8 feet, 2.4 inches from the outside edge of the white line, and 8 feet, 7.2 inches from the inside edge of the

white line. The county engineer did not object to mailboxes and driveway drainage pipes located closer to Savage Road, four to six feet from the pavement. And the pole in *Turner* was even closer to the pavement, at three feet, nine inches from the white line.

{¶ 37} ODOT's clear-zone standards leave room for engineering discretion and do not impose a duty to remove all obstructions within the clear zone unless they interfere with normal roadway travel. ODOT states that its Location and Design Manual "should be used as a guide for establishing clear zones for various types of highways and operating conditions" and that "full consideration[ ] shall be given to sound engineering principles and economic factors." *See also Steele v. Ohio Dept. of Transp.*, 162 Ohio App.3d 30, 2005-Ohio-3276, 832 N.E.2d 764, ¶ 10 (10th Dist.) (ODOT clear-zone guidelines did not impose duty to remove object "unless it interfere[s] with safe travel on the regularly traveled portion" of roadway); *Floering v. Roller*, 6th Dist. Wood No. WD-02-076, 2003-Ohio-5679, ¶ 22 (ODOT manual did not give rise to duty to remove all trees in clear zone). Noncompliance with the manual's guidelines, without more, does not establish an unsafe condition.

{¶ 38} To be clear, our holding here does not limit a finding of liability only for obstructions located in the improved roadway. As we noted in *Turner*, there may be cases where off-the-road placement of a pole interferes with the usual and ordinary course of travel. For example, in *Swaisgood v. Puder*, 6th Dist. Erie No. E-06-033, 2007-Ohio-307, a telephone pole located three feet, nine inches from the paved road did not allow sufficient clearance for a tractor-trailer to make a proper right-hand turn. *See Turner*, 118 Ohio St.3d 215, 2008-Ohio-2010, 887 N.E.2d 1158, at ¶ 25, citing *Swaisgood*.

{¶ 39} The evidence here, however, does not present a case in which the placement of a utility pole interfered with normal travel on a roadway. The Links did not provide any evidence that a motorist driving on the improved portion of

Savage Road would have come in contact with the pole, which was located 6 feet, 3.6 inches from the pavement edge and 8 feet, 2.4 inches from the outside edge of the white line. Absent evidence of interference with the usual and ordinary course of travel on the roadway, CEI and FirstEnergy did not have a duty to remove off-road objects within the public right-of-way that might come in contact with wayward vehicles.

## CONCLUSION

{¶ 40} We conclude that CEI and FirstEnergy were not required by any applicable law pursuant to R.C. 4931.03 to move the pole involved in Link's accident or to obtain a permit to leave the pole in its existing position. We also conclude that the pole did not incommode or interfere with the usual and ordinary course of travel on Savage Road. As a matter of law, CEI and FirstEnergy cannot be held liable, under any theory of liability asserted by the Links.

{¶ 41} We therefore reverse the judgment of the Eighth District Court of Appeals and remand the matter to the trial court to enter judgment for appellants.

Judgment reversed

and cause remanded.

O'CONNOR, C.J., and LANZINGER and KENNEDY, JJ., concur.

O'DONNELL, J., dissents.

O'NEILL, J., dissents in an opinion that PFEIFER, J., joins.

_____

**O'NEILL, J., dissenting.**

{¶ 42} Respectfully, I must dissent.

{¶ 43} The ultimate question in this matter is whether the defendant utility companies retained permission to leave eight utility poles in locations that had become dangerous due to the widening of a road. A duly empaneled jury found that one of the poles was involved in an accident that resulted in serious injuries.

**{¶ 44}** Defendants-appellants, the Cleveland Electric Illuminating Company ("CEI") and FirstEnergy Service Company ("FirstEnergy"), argue that they are not liable as a matter of law because they had permission to place the pole in its existing location in 1952. They are correct, assuming that the permission was not rescinded.

**{¶ 45}** If the "necessary permission" to place the pole was granted and never rescinded, the majority explains, then defendants have established the first prong of the standard set forth in *Turner v. Ohio Bell Tel. Co.*, 118 Ohio St.3d 215, 2008-Ohio-2010, 887 N.E.2d 1158. I can readily agree with that reasoning.

**{¶ 46}** But the record shows that the Bainbridge Township Board of Trustees had demanded that defendants move the eight poles in question. Defendants argue that affirmance of the court of appeals' judgment in this case would require utility companies to survey "poles and other items that are in the areas surrounding the tens of thousands of miles of roadways in hundreds of Ohio's unincorporated townships." But this roadway had been widened—at the time of the accident, the poles were significantly closer to the edge of Savage Road than they had been when installed back in 1952. The existing locations of the eight poles created the hazard only in light of changed circumstances. And the board sent defendants a letter rescinding permission to leave the poles in their existing locations after the widening of the road.

**{¶ 47}** Defendants were drawn into the Savage Road matter when in 2008, the Geauga County engineer sent CEI his Savage Road improvement plans with utility poles "in the construction area" highlighted. CEI responded with a form letter that had a box filled in, indicating that there were poles that would have to be moved. Shortly thereafter, CEI sent the county engineer a detailed schematic indicating that it would move *approximately 37 poles* along Savage Road. According to this plan, the pole involved in the accident at issue was to be moved nine feet further away from the road. In 2009, however, motivated by budgetary

constraints, CEI ultimately determined that safety concerns did not, in fact, require relocation of 8 of the 37 poles, including the pole at issue in this case, and decided not to move them.

{¶ 48} Contrary to the majority's assertion, the Bainbridge Township Board of Trustees did not fail to act thereafter. In May 2010, a car swerved to avoid a deer and hit one of the eight dangerously placed poles that CEI had decided not to relocate in 2009. *Bidar v. Cleveland Elec. Illum. Co.*, 8th Dist. Cuyahoga No. 97490, 2012-Ohio-3686. The next month, according to the minutes of its June 14, 2010 meeting, the board reached a "general agreement" that a letter asking CEI to move the eight poles should be drafted. Ten days later, on June 24, the chairman of the board sent CEI a letter stating, "We are concerned about the location" of the utility poles that CEI had chosen not to relocate. The letter requested that CEI submit a schedule for moving the eight poles on account of their dangerous placement. The letter further observed, "[I]t is apparent that safety dictates the relocation of these poles to an adequate distance from the roadway and in line with the other poles on Savage Road." Upon receipt of that letter, CEI was on notice that its permission to leave the eight poles in place had been unequivocally rescinded. *See Elster v. Springfield*, 49 Ohio St. 82, 97, 30 N.E. 274 (1892) ("whatever grant may have been made by the town * * * could have no greater operation than as a temporary license, subject to be revoked at the will of the town or city, as its necessities in the future uses of the street might require").

{¶ 49} At trial, the chairman of the board testified that the board intended this letter to "make [relocation of the poles] happen." On September 10, 2010, CEI responded, offering in a letter to "draw up costs for [the township]" if it was interested in relocating the poles. Just a few weeks later, a deer ran plaintiff-appellee Douglas Link's motorcycle off the road and into one of the eight poles that CEI had decided not to relocate.

**{¶ 50}** My disagreement with the majority opinion is based on the standard of review it employs and its determination that the board failed to act after CEI decided not to move the poles. The jury has already entered a verdict in favor of the Links. Our role on appeal is limited by our standard for reviewing a judgment notwithstanding the verdict. Although we are to conduct a de novo review of the sufficiency of the evidence, the majority points out that we are also required to construe the evidence at trial most strongly in favor of the Links. Majority opinion at ¶ 22, citing *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 23. I dissent because I believe that the majority has taken the liberty of reevaluating the evidence contrary to the correct legal standard of review. We are not jurors, and the jurors apparently found that defendants had been placed on notice that (1) the poles were a hazard and (2) the board of trustees had rescinded permission for CEI to leave the eight poles in their hazardous locations.

**{¶ 51}** As explained above, the evidence was sufficient to allow the jury to reach these conclusions. The board chairman's letter alone, properly construed in the light most favorable to the Links, allows a reasonable inference that the chairman requested a schedule for moving the eight dangerously placed poles in his official capacity on behalf of the board. The majority ignores the fact that the evidence flatly contradicts any assertion that defendants had ongoing permission to leave the poles where they were. They did not.

**{¶ 52}** The majority states that if the board of trustees had initiated more "formal" legal proceedings or taken official legal action to rescind whatever presumed lawful permission was granted in the 1950s, then defendants might not have established the first prong of *Turner*. Majority opinion at ¶ 7. The majority suggests that the board should have declared the eight poles a public nuisance and ordered their removal under R.C. 5571.14. Majority opinion at ¶ 32. I disagree. The chairman of the board explained at trial that the trustees serve part-time and

do not always know what to do without direction from the county prosecutor or county engineer. The fact that the board of trustees did not follow the procedure outlined in R.C. 5571.14 suggests more strongly that it was not aware that that statute existed than that it consciously decided to allow CEI to leave the eight poles where they were.

{¶ 53} That the board of trustees applied a softer touch when working with a private entity cannot override the jury verdict against defendants. A declaration of public nuisance under R.C. 5571.14 is an undiplomatic final act of an aggrieved township. It is certainly not the only act sufficient to rescind permission to use the township's roadway easement for placement of a utility pole. Instead, the board of trustees was empowered with "control of the township roads of [the] township." R.C. 5571.02. "Control" must entail at least the discretion as to how to demand that a utility company move its pole to a safer location within a township's easement.

{¶ 54} Even assuming that the evidence that permission was rescinded is weak or conflicts with other facts in the record—a proposition I disagree with— that evidence is *sufficient* when construed most strongly in favor of the Links. For that reason, the jury's verdict should stand. Properly understood, the majority opinion holds that the township could have more clearly rescinded permission by an official declaration of public nuisance instead of a letter sent pursuant to the "general agreement" of the board reflected in the minutes of its meeting. This court does not and should not throw out jury verdicts based on our own determination of what evidence would have been better proof. It is simply irrelevant whether a majority of this court would come to the same conclusion as the jury did. That is a question of the weight of the evidence, and answering that question was the role of the jury below.

{¶ 55} Respectfully, I dissent.

PFEIFER, J., concurs in the foregoing opinion.

_____

DeMarco & Triscaro, Ltd., and Joseph J. Triscaro, for appellees.

Calfee, Halter & Griswold, L.L.P., Thomas I. Michals, John J. Eklund, William E. Coughlin, and Eric S. Zell, for appellants.

Frost Brown Todd, L.L.C., Frank J. Reed Jr., and Alexander L. Ewing, urging affirmance for amici curiae the County Commissioners Association of Ohio and the Ohio Township Association.

Melissa R. Lipchak, urging affirmance for amicus curiae Ohio Association for Justice.

Edward L. Bettendorf, urging reversal for amicus curiae the Ohio Bell Telephone Company.

_____