**[Cite as *Lester v. FCA US, L.L.C.*, 2022-Ohio-1776.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| DEREK LESTER, | : | APPEAL NOS. C-210532 |
| | | C-210536 |
| Plaintiff-Appellee/Cross-Appellant, | : | TRIAL NO. A-1804511 |
| | : | |
| vs. | : | *O P I N I O N.* |
| | : | |
| FCA US LLC, | : | |
| | : | |
| Defendant-Appellant/Cross-Appellee. | : | |


Civil Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: May 27, 2022


*Scarlett M. Steuart* and *Elizabeth Ahern Wells*, for Plaintiff-Appellee/Cross-Appellant,

*Sutter O'Connell* and *Kevin W. Kita*, for Defendant-Appellant/Cross-Appellee.

**MYERS, Presiding Judge.**

{¶1} This case arises out of allegations by plaintiff-appellee/cross-appellant Derek Lester that his new Ram truck was defective and that defendant-appellant/cross-appellee FCA US LLC ("FCA") failed to diagnose and repair the defect under warranty. Following a jury trial, the jury specifically found that Lester's truck had no defect that was covered under FCA's written warranties and that FCA did not breach the implied warranty of merchantability. Judgment was entered in favor of FCA on Lester's Lemon Law, Magnuson-Moss Warranty ("MMWA"), and breach-of-warranty claims. The jury found in favor of Lester on his claim that FCA violated the Consumer Sales Practices Act ("CSPA"), finding that FCA committed an unfair or deceptive act in relation to Lester's purchase of the truck. The trial court entered judgment in favor of Lester on his CSPA claim, and awarded him damages and attorney fees. Both parties appealed.

{¶2} We find no merit in Lester's argument that the trial court erred by failing to properly instruct the jury as to his burden of proof on his Lemon Law claim. In addition, we hold that the trial court should have granted FCA's motion for judgment notwithstanding the verdict on Lester's CSPA claim. We remand for the trial court to enter judgment in favor of FCA on the CSPA claim and to vacate its awards of damages and attorney fees. We affirm the trial court's judgment in all other respects.

### Factual and Procedural Background

{¶3} On November 14, 2016, Lester purchased a new 2016 Ram 1500 truck. With his purchase of the vehicle, Lester received FCA's three-year/36,000-mile Basic Limited Warranty, in which FCA promised to cover "the cost of all parts and labor needed to repair any item on [the] vehicle when it left the manufacturing plant that is defective in material, workmanship, or factory preparation." Tires are expressly not covered under the warranty. Lester also received FCA's five-year/100,000-mile

Powertrain Warranty, in which FCA promised to cover repairs to only certain listed powertrain components.

{¶4} Because Lester experienced an intermittent vibration in the truck when driving at highway speeds, he had its tires checked at Firestone Complete Auto Care, where he worked, the same day that he bought the truck. When Lester rebalanced the tires, he noticed flat spots in them. He testified that the rebalancing did not fix the vibration. He placed an order for new tires because he was "suspect of flat spots," and he preferred the thread design on the tires he ordered. The tires that he ordered were not installed on the truck until January 4, 2017.

{¶5} On November 26, Lester took the truck to Northgate Chrysler, reporting that the truck vibrated at 65 m.p.h. A technician determined that the tires were not in balance and rebalanced them. Lester returned to Northgate on November 29, with the same complaint about vibration. Northgate technicians attempted to balance the tires again but were unable to do so and recommended that Lester replace the tires. Lester returned to Northgate on November 30, and requested that the technicians swap tires from a new truck to test drive it. The technicians test drove the truck with tires swapped from a new vehicle, and reported that "no vibration was felt" with those tires. They put Lester's original tires back on his truck and balanced them. Lester went back to Northgate on December 2, but was told they could do nothing more for him.

{¶6} On December 6, Lester took his truck to a second dealership, Kings Chrysler, reporting that he felt vibration above 60 m.p.h. A technician test drove the truck and found that it "would shake violently" above 60 m.p.h. The technicians swapped tires with a new truck on the dealership lot and determined that the vibration "diminished considerably." They put Lester's tires back on his truck and recommended that he purchase new tires. Lester returned to Kings on December 16, and technicians determined that the truck's rear wheels were "out of round," and replaced them.

{¶7} On January 4, 2017, Lester replaced the original Goodyear tires with new Firestone tires (that he ordered on the day he bought the truck). Still not satisfied with the vibration of the truck, he replaced those new tires with a new set of Bridgestone tires on February 7. Two days later, on February 9, he returned to Kings, reporting that his truck's passenger seat shook at highway speeds. A technician who rode with Lester on a test drive reported that he "could not feel a vibration[,] felt very smooth to me." No repairs were performed at Kings.

{¶8} On February 16, Lester took his truck to a third dealership, Jeff Wyler Chrysler. The technicians test drove it and verified that the passenger seat shook at highway speeds. They checked that the seat was mounted properly, and they performed no repairs, noting that the truck "is operating as designed."

{¶9} On March 14, Lester replaced the Bridgestone tires with new Firestone tires. According to Lester, the vibration problem persisted.

{¶10} At some later point, when an employee of a fourth dealership, Jake Sweeney Chrysler, entered Lester's Firestone store to make a purchase, Lester told him about the vibration he felt with his truck, so the Jake Sweeney employee told him to bring it to his dealership. On December 12, Lester took his truck to Jake Sweeney. No repairs were performed. According to Lester, the technicians told him that he needed to get a vibration analyzer but they did not have one. Lester testified, "When I went to pick up the car, they told me I needed to get a vibration analyzer, and they didn't have it. And they had to order it in, and they would call me." When he realized that the printed work order did not include "anything on it as to what they did or what the next steps were," he requested that an employee handwrite on the work order that they had road tested the truck and that they were waiting on a vibration analyzer. A handwritten note on the work order stated: "shop foreman road tested and experienced vibration/waiting on analyzer will call."

**{¶11}** Lester reinstalled the original Goodyear tires on his truck in January 2018. He testified that the truck's vibration persisted. Having received no call from Jake Sweeney, he called four or five different dealerships in an attempt to find a vibration analyzer, but none of them had one.

**{¶12}** In February, FCA initiated Customer Assistance Inquiry Record (CAIR) 33350085 in regards to Lester's concern. The record stated that FCA "[c]ontacted Jake Sweeney. They have a vibration analyzer, but they only use it when the vehicle has a vibration. This vehicle does not."

**{¶13}** In August 2018, Lester filed an action against FCA, alleging claims for: (1) violation of Ohio's Lemon Law; (2) breach of express and implied warranty in violation of the MMWA; (3) violation of Ohio's CSPA; and (4) tortious breach of warranty. As relevant here, Lester alleged that FCA breached the CSPA by violating the Lemon Law and the MMWA and by breaching its expressed or implied warranties.

**{¶14}** In March 2020, the case proceeded to a jury trial.

**{¶15}** At trial, Lester testified to the truck's vibration at highway speeds and about his taking it to multiple FCA dealerships. He said he had owned the truck just over three years and that he had put about 75,000 to 80,000 miles on the truck. He acknowledged, as a person "working in the industry," that his putting approximately 22,000 to 25,000 miles on the truck per year was "on the high end of average," in that "most people drive about 15 to 18,000 miles a year." He had taken the truck on trips to Tennessee multiple times, and to North Carolina as well. He had never taken the truck to a dealership for any concern other than the vibration he felt at highway speeds. The truck had never broken down, failed to start, or had any other problems, including when he used it to tow his boat on a trailer.

**{¶16}** Lester's expert witness, Matt Overbeck, an automotive technician and owner of an independent automotive repair facility, testified that in January 2019, Lester retained him to inspect his truck. When Lester took him on a test drive,

Overbeck said they were able to experience the truck's vibration in different degrees of intensity, which varied by speed and road condition. He said that he felt the vibration "in the butt of the seat," and noticed that the rear-view mirror and seat backs shook.

{¶17} Overbeck performed a visual inspection of the wheels, tires, suspension components, and drivetrain, and found nothing that appeared to be "worn, unsafe, [or] out of place." He observed no obvious issues with the wheels and tires when he put them on a balancer. He did not believe that the tires would cause the truck's vibration. He saw nothing unsafe about the truck, no fluid leaks, no signs of abnormal wear, no loose or misplaced or misaligned parts. He agreed that the truck ran well, and other than his feeling a vibration, he discerned no other issues with the truck's mechanical functions.

{¶18} Overbeck was asked about a diagnostic tool called a vibration analyzer. He testified that a vibration analyzer is not necessary to diagnose vibration. He said that instead of using a vibration analyzer, he determines whether a vibration exists "from a seat of the pants customer perception[,] [t]echnician perception of what would be considered abnormal or out of the ordinary." According to Overbeck, the vibration that he experienced in Lester's truck was not what he considered to be normal operation of the vehicle. He acknowledged that he did not know whether the amount of vibration he felt in the truck was within normal limits, and that he could not testify as to whether Lester's truck operated differently than any other 2016 Ram 1500.[1]

{¶19} In its case,[2] FCA presented the testimony of Roland Dube, a technical adviser employed by FCA. Dube testified that a vibration analyzer is a computer box with sensors that indicate the strength and speed of vibrations. He said the device can

---

[1] Lester also presented the testimony of his stepbrother Kodie Artmayer and of his friend, Vincent Kreinist, a vehicle repair technician.
[2] FCA also presented the testimony of Chad Moss, Lester's coworker at Firestone Complete Auto Care.

help a technician pinpoint the source of a vehicle's vibration and can diagnose whether or not a vehicle is vibrating abnormally.

{¶20} Dube performed an inspection of Lester's truck in March 2019 and found nothing that would cause the truck to vibrate abnormally. When he test drove the truck, he felt no abnormal vibration, and said that he "thought the truck drove actually better than average." He used a vibration analyzer on the truck, which registered no abnormal vibrations and confirmed what he described as "the seat of the pants feel." In his opinion, the truck was fit for its ordinary purpose of providing personal transportation and contained no warranty defect.

{¶21} The trial court denied FCA's motions for a directed verdict made at the close of Lester's evidence and at the close of all the evidence, and the case was submitted to the jury. The jury returned a verdict in favor of FCA on Lester's Lemon Law, MMWA, and breach-of-warranty claims. In response to interrogatories, the jury expressly found that Lester's vehicle did not have a defect that was covered under FCA's written warranties and that FCA did not breach its implied warranty of merchantability. The jury found in favor of Lester on his CSPA claim, finding that FCA committed an unfair or deceptive act, which the jury described in an interrogatory as: "Dealer had possession of a vibration analyzer (CAIR # 33350085) and never contacted plaintiff[.]" The jury awarded Lester $10,000 as economic damages and $1,500 as damages for mental anguish or emotional distress on his CSPA claim. The trial court overruled FCA's motion for judgment notwithstanding the verdict ("JNOV").

{¶22} In September 2021, the trial court held a hearing on Lester's motion for attorney fees. Thereafter, the court entered judgment in favor of Lester against FCA on the CSPA claim in the amount of $11,500, plus court costs. With respect to the CSPA claim, the court found, "[I]t is an unfair or deceptive act or practice for a supplier to have possession of a vibration analyzer but never contact the consumer." The court

awarded Lester $41,213.25 in attorney fees and litigation costs. The court dismissed Lester's Lemon Law, MMWA, and breach-of-warranty claims with prejudice. FCA filed an appeal, and Lester filed a cross-appeal. We address Lester's cross-appeal first.

### Lester's Cross-Appeal

{¶23} In a single assignment of error, Lester argues that the trial court erred when it instructed the jury as to the burden of proof required to establish a defect for purposes of his Lemon Law claim. He asserts that the court's instructions did not adequately state Ohio law regarding a consumer's burden of proof in establishing a defect. He contends that he was prejudiced by the error because the jury was misled into believing that he was required to meet a higher burden of proof in establishing a defect than is required by Ohio law.

{¶24} A trial court must provide jury instructions that correctly and completely state the law, which are warranted by the evidence in a case. *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 22. "The question of whether a jury instruction is legally correct and factually warranted is subject to de novo review." *Id.* Generally, requested instructions should be given if they are correct statements of the law, are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the instruction. *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240, citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991); *Hayes v. Durrani*, 1st Dist. Hamilton No. C-190617, 2021-Ohio-725, ¶ 9.

{¶25} A trial court need not give a proposed instruction in the precise language requested by the party and retains discretion to use its own language to communicate the same legal principles. *Becker v. Direct Energy, LP*, 2018-Ohio-4134, 112 N.E.3d 978, ¶ 78 (2d Dist.); *New Concept Hous., Inc. v. United Dept. Stores Co.*, 1st Dist. Hamilton No. C-080504, 2009-Ohio-2259, ¶ 21. And the court has discretion to refuse to give a requested instruction that is either redundant or immaterial to the

case. *New Concept Hous., Inc.* at ¶ 21; *Oxford Mining Co., LLC v. Ohio Gathering Co., LLC*, 7th Dist. Belmont No. 19 BE 0016, 2020-Ohio-1363, ¶ 81.

**{¶26}** R.C. 1345.72 provides in relevant part:

(A) If a new motor vehicle does not conform to any applicable express warranty and the consumer reports the nonconformity to the manufacturer, its agent, or its authorized dealer during the period of one year following the date of original delivery or during the first eighteen thousand miles of operation, whichever is earlier, the manufacturer, its agent, or its authorized dealer shall make any repairs as are necessary to conform the vehicle to such express warranty, notwithstanding the fact that the repairs are made after the expiration of the appropriate time period.

(B) If the manufacturer, its agent, or its authorized dealer is unable to conform the motor vehicle to any applicable express warranty by repairing or correcting any nonconformity after a reasonable number of repair attempts, the manufacturer, at the consumer's option * * * either shall replace the motor vehicle with a new motor vehicle acceptable to the consumer or shall accept return of the vehicle from the consumer and refund each of the following:

(1) The full purchase price;

(2) All incidental damages, including, but not limited to, any fees charged by the lender or lessor for making or canceling the loan or lease, and any expenses incurred by the consumer as a result of the nonconformity, such as charges for towing, vehicle rental, meals, and lodging.

{¶27} "Nonconformity" means "any defect or condition that substantially impairs the use, value, or safety of a motor vehicle to the consumer and does not conform to the express warranty of the manufacturer or distributor." R.C. 1345.71(E).

{¶28} In sum, to prevail on a Lemon Law claim, a plaintiff must demonstrate: (1) the plaintiff is the owner of a motor vehicle covered by an express warranty; (2) the motor vehicle does not conform to the applicable express warranty; (3) the plaintiff reported the nonconformity to the manufacturer, its agent, or its authorized dealer within one year following the original date of delivery or the first 18,000 miles of operation, whichever is earlier; and (4) the manufacturer, its agent, or its authorized dealer is unable to conform the vehicle to any applicable express warranty by repairing or correcting a defect that substantially impairs the use, value, or safety of the motor vehicle, after a reasonable number of repair attempts. *See Diguglielmo v. FCA US LLC*, 6th Dist. Lucas No. L-19-1187, 2020-Ohio-2858, ¶ 29; *Iams v. DaimlerChrysler Corp.*, 174 Ohio App.3d 537, 2007-Ohio-6709, 883 N.E.2d 466, ¶ 13 (3d Dist.).

{¶29} Lester requested that the trial court give the following instruction on a consumer's burden of proof in establishing a defect:

> Under the Ohio Lemon Law, the Plaintiff is required to present evidence that from which a reasonable inference can be made that a specific problem with the vehicle is due to a defective part which is covered by the warranty. Symptoms may be circumstantial evidence of a defect. The Plaintiff does not prove the precise cause of the condition, and you may find a nonconformity exists even if the evidence fails to eliminate all other possible causes of the problem.

{¶30} Lester acknowledges that the applicable Ohio Jury Instruction ("OJI") for "Nonconforming motor vehicle (Lemon Law)" states in relevant part: "To recover, the plaintiff must prove that the * * * motor vehicle does not conform to (*describe applicable express warranties*)[.]" 1 *Ohio Jury Instructions*, CV Section 529.01. (Rev.

Aug. 20, 2008). But, Lester argues, this is simply "the suggested language," which "the trial court has the discretion to supplement[.]" He contends that "[t]he trial court's error was in not exercising its discretion to supplement the OJI instructions" and "in failing to give a complete and accurate statement of a consumer's burden of proof in establishing a defect."

{¶31} In its instructions to the jury, the trial court used the first sentence, nearly verbatim, from Lester's proposed instruction:

> The Plaintiff is required to present evidence that from which a reasonable inference can be made that a specific problem with the vehicle is due to a defective part of the vehicle which is covered by FCA US's express written warranty.

{¶32} The trial court's instruction was an accurate and complete statement of the law set forth in R.C. 1345.72(A), and went beyond the suggested OJI to include language permitting the jury to reasonably infer that a warrantable defect caused the vehicle's problem. Nothing in the language of the court's instruction suggested that Lester was required to identify a certain defect or eliminate all possible causes of the problem. The additional instructions proposed by Lester merely restated that the jury was permitted to infer that the symptom or problem was due to a defective part. The trial court did not abuse its discretion by refusing to give Lester's redundant instructions. We overrule Lester's sole assignment of error.

### *FCA's Appeal*

{¶33} In three assignments of error, FCA argues that the trial court erred by (1) denying FCA's motion for a directed verdict on Lester's CSPA claim; (2) failing to grant FCA's motion for JNOV on Lester's CSPA claim; and (3) exceeding its statutory authority under R.C. 1345.09 in granting attorney fees to Lester. We analyze the

assignments of error out of order because the second assignment of error is dispositive of FCA's appeal.

**{¶34}** In its second assignment of error, FCA argues that the trial court erred by not granting its motion for JNOV because the jury's findings of fact precluded recovery under the CSPA. We agree.

**{¶35}** A Civ.R. 50(B) motion for JNOV will be granted when the evidence, construed most strongly in favor of' the nonmoving party is not " 'legally sufficient to sustain the verdict' rendered at trial." *WWSD, LLC v. Woods*, 10th Dist. Franklin No. 20AP-403, 2022-Ohio-952, ¶ 77, quoting *Environmental Network Corp. v. Goodman Weiss Miller L.L.P.*, 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 23. Conversely, a motion for JNOV must be denied when substantial, competent evidence has been presented from which reasonable minds could reach different conclusions. A trial court's ruling on a motion for JNOV presents a question of law that we review de novo. *Link v. Firstenergy Corp.*, 147 Ohio St.3d 285, 2016-Ohio-5083, 64 N.E.3d 965, ¶ 22. In reviewing the trial court's denial of FCA's motion, we must construe the evidence most strongly in favor of Lester. *Id.*

**{¶36}** The CSPA prohibits suppliers from committing unfair or deceptive consumer sales practices or unconscionable acts or practices in connection with a consumer transaction, whether the act or practice occurs before, during, or after the transaction. R.C. 1345.02(A) and 1345.03(A). In general, the act "defines 'unfair or deceptive consumer sales practices' as those that mislead consumers about the nature of the product they are receiving, while 'unconscionable acts or practices' relate to a supplier manipulating a consumer's understanding of the nature of the transaction at issue." *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 24.

**{¶37}** In determining whether an act or practice is deceptive for purposes of the CSPA, the question is whether the supplier did or said something, regardless of

intent, that has the likelihood of inducing in the mind of a consumer a belief that was not in accord with the facts. *Frank v. WNB Group, LLC*, 2019-Ohio-1687, 135 N.E.3d 1142, ¶ 26 (1st Dist.). For conduct to be deceptive under the CSPA, it must be both false and material to the consumer transaction. *Grgat v. Giant Eagle, Inc.*, 2019-Ohio-4582, 135 N.E.3d 846, ¶ 16 (8th Dist.); *Richards v. Beechmont Volvo*, 127 Ohio App.3d 188, 711 N.E.2d 1088 (1st Dist.1998).

**{¶38}** Courts have held that a manufacturer's breach of warranty can constitute a violation of the CSPA. *Boyle v. Daimler Chrysler Corp.*, 2d Dist. Clark No. 2001-CA-81, 2002-Ohio-4199, ¶ 74 (manufacturer's failure to repair a defect covered by a warranty); *Layne v. McGowen*, 2d Dist. Montgomery No. 14676, 1995 Ohio App. LEXIS 2120 (May 24, 1995). However, where a consumer's CSPA claim is predicated upon a manufacturer's breach of warranty, the CSPA claim cannot survive where there is no evidence that the manufacturer breached the warranty. *Whitt v. Mazda Motor of Am., Inc.*, 5th Dist. Stark No. 2010CA00343, 2011-Ohio-3097, ¶ 26 (summary judgment appropriately granted on CSPA claim where the manufacturer breached no warranty obligations); *Tsirikos-Karapanos v. Ford Motor Co.*, 2017-Ohio-8487, 99 N.E.3d 1203, ¶ 41 (8th Dist.) (summary judgment properly granted where consumer failed to prove existing defect or a resulting breach of warranty).

**{¶39}** In this case, Lester alleged FCA violated the CSPA by violating the MMWA and the Lemon Law and by breaching its express or implied warranties. At trial, the parties stipulated that Lester was a "consumer," FCA was a "supplier," and the sale of the 2016 Dodge Ram 1500 was a "consumer transaction," as those terms are defined in the CSPA. Therefore, the only issue remaining for the jury was whether FCA committed an unfair, deceptive, or unconscionable act in connection with the sale of the vehicle by breaching its express or implied warranties.

**{¶40}** The jury found in favor of FCA on Lester's MMWA, Lemon Law, and breach-of-warranty claims, each of which was predicated on the existence of a

warrantable defect. The jury specifically found no warrantable defect and that FCA breached no warranty. Because Lester's CSPA claim was derivative of his other warranty claims, the jury's finding of no warrantable defect was fatal to the CSPA claim, and the trial court should have granted FCA's motion for JNOV on that claim.

{¶41} Acknowledging the jury's verdict in favor of FCA on his MMWA, Lemon Law, and breach-of-warranty claims, Lester now contends that his CSPA claim was not derivative of those claims. He points out that he argued at trial that FCA violated the CSPA not only by breaching its warranties, but by refusing "to look any further to diagnose the truck's vibration." This is just another way of saying that FCA breached its warranty obligation by disclaiming responsibility under the warranties to repair a defect.

{¶42} For the first time, Lester asserts that FCA's unfair or deceptive act occurred when "FCA explicitly instructed Jake Sweeney not to use the vibration analyzer in its possession on Lester's truck." Lester made no such allegation in his arguments at trial. Rather, he argued that the unfair practice committed by FCA occurred when he was refused service at the dealerships, when the dealerships refused to inspect the drivetrain and suspension, and/or when FCA failed to use corporate resources to diagnose the problem. Noticeably absent from his argument was the claim that FCA instructed Jake Sweeney not to use the vibration analyzer.

{¶43} Not only did Lester not argue it at trial, but no evidence or testimony at trial suggested that FCA instructed the dealer not to use it. Moreover, the jury made no such finding—the jury found the unfair or deceptive act to be: "Dealer had possession of a vibration analyzer (CAIR # 33350085) and never contacted plaintiff[.]" That CAIR record simply stated that FCA "[c]ontacted Jake Sweeney. They have a vibration analyzer, but they only use it when the vehicle has a vibration. This vehicle does not."

{¶44} Whether the dealership told Lester about the vibration analyzer, the jury's specific findings of no defect and no breach of warranty precluded any finding that FCA misled Lester about the nature of the vehicle or the application of its warranties. And the dealership's conduct, even if it could be said to have been "false," was not "material" to the transaction where Dube's use of a vibration analyzer on Lester's truck served to support the absence, rather than the presence, of a defect. Moreover, Lester's trial counsel argued in closing that the results of Dube's use of the device should be discounted because the device is so rarely used and is unnecessary to diagnose a vibration problem. The jury's finding that FCA committed an unfair or deceptive act by its dealer's failure to contact Lester about its possession of a device to diagnose a defect was inconsistent with its findings that the truck had no defect to diagnose or repair and that FCA did not breach its warranties. Therefore, in the absence of a defect, notice to Lester regarding a vibration analyzer was immaterial, and therefore, not "deceptive" under the CSPA, as a matter of law.

{¶45} Because the trial court erred by failing to grant FCA's motion for JNOV on Lester's CSPA claim, we sustain FCA's second assignment of error. We remand this case to the trial court with instructions that it enter judgment in favor of FCA on Lester's CSPA claim and that it vacate its awards for damages and for attorney fees. Our disposition of this assignment of error renders moot FCA's first and third assignments of error. We affirm the trial court's judgment in all other respects.

Judgment accordingly.

BERGERON and CROUSE, JJ., concur.

Please note:

The court has recorded its own entry this date.