[Cite as *State Farm Fire & Cas. Co. v. Capital Roofing, L.L.C.*, 2020-Ohio-642.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State Farm Fire & Casualty Company.,
et al.,

        Plaintiffs-Appellants,

v.

Capital Roofing, LLC, et al.,

        Defendants-Appellees.

:
:
:
:
:
:
:

No. 18AP-689
(C.P.C. No. 16CV-4785)

(REGULAR CALENDAR)

---

State Farm Fire & Casualty Company.,
et al.,

        Plaintiffs-Appellees,

v.

Capital Roofing, LLC, et al.,

        Defendants-Appellants.

:
:
:
:
:
:
:

No. 18AP-691
(C.P.C. No. 16CV-4785)

(REGULAR CALENDAR)

---

State Farm Fire & Casualty Company.,
et al.,

        Plaintiffs-Appellees,

v.

Capital Roofing, LLC, et al.,

        Defendants-Appellants.

:
:
:
:
:
:
:

No. 18AP-692
(C.P.C. No. 16CV-6326)

(REGULAR CALENDAR)

D E C I S I O N

Rendered on February 25, 2020

**On brief:** *Keis George, LLP*, *Herbert L. Nussle*, and *Ethan Clark,* for plaintiffs-appellants/appellees State Farm Fire & Casualty Company and Mount Air Condominium Association.

**On brief:** *Isaac Wiles Burkholder & Teetor, LLC*, and *Dale D. Cook* for defendants-appellees/appellants Capital Roofing, LLC and Mark Kissling.

APPEALS from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} State Farm Fire & Casualty Company (as subrogee of Mount Air Condominium Association and an individual condominium unit owner) and Mount Air Condominium Association (collectively, "State Farm") appeal from a judgment entered on August 15, 2018 in favor of Capital Roofing, LLC and Mark Kissling (collectively "Capital") based upon a jury verdict. Capital appeals from the same judgment to the extent it incorporated two decisions issued on November 7, 2017 and January 22, 2018, granting summary judgment against Capital and in favor of State Farm in amounts of $79,949.52, $378,065.81, and $5,000.00.

{¶ 2} Because genuine issues of material fact existed in the summary judgment record as to elements of State Farm's vicarious liability claim but not as to State Farm's breach of contract claim, we reverse the grant of summary judgment in favor of State Farm as to that vicarious liability claim but affirm as to the breach of contract claim. Because the evidence presented at trial was sufficient to support the jury's verdict in favor of Capital, State Farm was not entitled to a directed verdict or judgment notwithstanding the verdict. We therefore modify the August 15, 2018 judgment entry granting judgment in favor of State Farm against Capital to reflect that the award is based solely on the breach of contract claim and affirm the portion of the August 15, 2018 entry memorializing the jury's verdict. Capital's second assignment of error is sustained; its third and fourth assignments of error are overruled, and its first assignment of error is moot. State Farm's three assignments of error are overruled.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 3} In May 2016, in Franklin C.P. No. 16CV-4785, State Farm Fire & Casualty Company, as insurer, assignee, and subrogee of fellow plaintiff, Mount Air Condominium Association, sued Connell's Construction, LLC and Capital Roofing, LLC for negligence and

breach of contract relating to a fire started by Connell's Construction while allegedly acting as an employee or agent of Capital Roofing in repairing a roof for Mount Air. (May 18, 2016 Compl. No. 16CV-4785; May 23, 2016 First Am. Compl. No. 16CV-4785.) Two months later, in Franklin C.P. No. 16CV-6326, Amica Mutual Insurance Company also sued as the property insurer for two individual condominium unit owners (collectively "Amica") whose unit had been damaged in the same fire. (July 6, 2016 Compl. No. 16CV-6326.) Capital answered and cross-claimed in both cases against Connell's Construction. (Aug. 8, 2016 Answer & Cross-Claim No. 16CV-4785; Aug. 8, 2016 Answer & Cross-Claim No. 16CV-6326.) Shortly thereafter, the two cases were consolidated. (Aug. 18, 2016 Consolidation Granted.)[1]

{¶ 4} On August 31, 2016, given Connell's Construction failure to plead or otherwise answer, the trial court granted default judgment against Connell's Construction in favor of State Farm for $383,065.81. (Aug. 31, 2016 Jgmt. Entry.) In November, the trial court granted default to Capital against Connell's Construction on its cross-claims for indemnity and contribution, amount damages to be assessed at a later date. (Nov. 18, 2016 Jgmt. Entry.)

{¶ 5} In spring 2017, State Farm intervened in the suit in another capacity, as subrogee of the insured owner of an individual condominium unit in the complex. (Mar. 6, 2017 Intervenor Compl.) The following month, in April 2017, State Farm amended its complaints to add claims against Mark Kissling (an individual agent of Capital Roofing who allegedly supervised the roofing work) and Archatas Inc. (an architecture firm involved in the roof project). (Apr. 28, 2017 State Farm Second Am. Compl.; Apr. 28, 2017 State Farm Intervenor First Am. Compl.)

{¶ 6} On August 9, 2017, Archatas requested summary judgment on the grounds that none of the plaintiffs had submitted expert testimony to show that it had failed to meet the standard of care or any evidence that it was involved with the roof repairs that caused the fire. (Aug. 9, 2017 Archatas Mot. for Summ. Jgmt.) In September 2017, State Farm moved for summary judgment also, arguing that Capital Roofing had breached its contract with the association and that it was liable vicariously for the negligence of Connell's

---

[1] The case involving Amica ultimately settled during trial and is not part of this appeal. (Jan. 30, 2018 Settlement Order; Feb. 7, 2018 Stipulation & Jgmt. Entry.) Thus, we discuss it no further.

Construction.  (Sept. 5, 2017 State Farm Mot. for Summ. Jgmt.)  The same day, Capital filed a summary judgment motion of its own as to all plaintiffs arguing that, as a matter of law, a general contractor is not liable for the negligent acts of an independent subcontractor and that Connell's Construction was such a subcontractor.  (Sept. 5, 2017 Capital Mot. for Summ. Jgmt.)

{¶ 7}  At the time the summary judgment motions were briefed and decided, in addition to the pleadings, a number of exhibits and depositions had been made part of the record.  Affidavits from David Mendum with attached records confirmed the amount of damages incurred and paid by State Farm and the deductible paid by Mount Air Condominium Association.  (Mendum Aff., filed Aug. 1, 2016; Exs. 4, 5, attached to Sept. 5, 2017 State Farm Mot. for Summ. Jgmt.)  The parties also introduced copies of the contracts between Mount Air and Capital Roofing and between Capital Roofing and Connell's Construction.  (Exs. 1-3, attached to Sept. 5, 2017 State Farm Mot. for Summ. Jgmt.)  In addition, depositions of John Adkins (president of Capital Roofing), Brandon Connell (president of Connell's Construction), and Mark Kissling (an agent of Capital Roofing) were filed.

{¶ 8}  Adkins testified that he founded Capital Roofing in 2009.  (Adkins Dep. at 13, filed Feb. 22, 2017.)  The company had very little equipment and no employees.  *Id.* at 15, 25-28.  Adkins explained that he used subcontractors for everything, and the basic function of his company was to make bids, organize jobs, and pay bills.  *Id.* at 30-32, 115-16, 124. Adkins agreed that he used Mark Kissling as an independent salesperson and allowed Kissling to run jobs through Capital Roofing for his own profit.  *Id.* at 35, 55-56.

{¶ 9}  Adkins stated that the Mount Air job was a Kissling job and that Kissling prepared the bid proposal to Mount Air, which was introduced in the deposition as exhibit 9.  *Id.* at 59-60.  Adkins agreed that Kissling subcontracted with Connell's Construction for the copper roofing portion of the job and that the contract governing that relationship was introduced as exhibit 3.  *Id.* at 75-76, 88-89.  Adkins stated that, generally, subcontractors are not told how to do a job and that he did not tell Connell's Construction how to do the job in this case.  *Id.* at 81-82, 110-11, 115-16.  He explained that subcontractors are merely provided with materials and a deadline and told to get the job done.  *Id.* at 81-82, 115-16.

{¶ 10} Regarding the specific event of the fire, Adkins stated that Kevin Taylor, father of Brandon Connell, was very good with copper work. *Id.* at 79-81, 90. But he acknowledged that he did not know if Brandon Connell knew how to do copper work. *Id.* He did not personally know the cause of the fire, as he was not at the job site at the time of the fire but did not dispute the contention that Brandon Connell's copper soldering work was the cause of the fire. *Id.* at 88-90. He stated that, after the fire, Brandon Connell admitted that Connell's Construction had allowed its insurance policy to lapse. *Id.* at 106-07.

{¶ 11} Brandon Connell testified in his deposition that he was the sole owner and operator of Connell's Construction at the relevant time. (Connell Dep. at 10-12, filed Feb. 22, 2017.) He testified that Connell's Construction had no equipment, not even a truck, and rented what it needed on a per job basis. *Id.* at 13. Connell said he sometimes bid jobs to Kissling but that on the Mount Air job there was no bid process. *Id.* at 27-30. Instead, a contract document was exchanged over e-mails and signed individually by himself and Adkins. *Id.* at 30, 32-33. Despite Adkins' signature on the contract, Connell said Kissling was his contact on the job. *Id.* at 32-33.

{¶ 12} Connell testified that he was not given plans or blueprints for the work; rather, Kissling specified a crew of four and met Connell and the three other workers (James Lust, Angelo Pruitt, and Kevin Taylor) at the job site to tell them how he wanted things done. *Id.* at 51, 56-57, 90, 109. According to Connell, Kissling told them what to do, how to do it, and provided all tools and equipment (including a ladder, torches, tanks, and safety equipment). *Id.* at 52-54, 91, 93-94. He did admit, however, that he brought some of his own hand tools and a fire extinguisher. *Id.* at 91-92. After they took some measurements on the roof, Kissling got up on the roof to show how he wanted the copper pans placed. *Id.* at 57, 117. Kissling also stayed to help for a time as they soldered copper pieces together on the ground before taking them up to the roof to put them in place. *Id.* Connell acknowledged that though Kissling told the workers how he wanted the soldering done, he did not demonstrate the technique. *Id.* at 61. Kissling did, however, veto a suggestion by Connell that the copper be riveted and sealed rather than soldered and also rejected a suggestion by Connell and his father, Kevin Taylor, that they obtain and use a soldering iron with a contained flame rather than open-flame torches for the job. *Id.* at 40-

41, 111-12.  In summation, Connell stated he believed that Kissling and Capital Roofing had the right to control his work, telling him when to show up, where to show up, and how the work should be done.  *Id.* at 80-82.

{¶ 13}  Regarding the actual event of the fire, Connell testified that he was working on the roof when he heard a crackling sound.  *Id.* at 99-100.  He pulled off a piece of fascia board and saw fire, initially thinking it was localized.  *Id.*  But when he pulled a hole in the roof with his claw hammer to check, flames came shooting out and he realized it was out of control.  *Id.* at 57-58, 99-100.  He told everyone to get off the building, and he and the other workers went inside to warn residents to evacuate.  *Id.* at 58.  Ultimately, the fire department came and extinguished the fire.  *Id.*

{¶ 14}  Connell testified that he had no experience soldering copper roofing and told Kissling as much.  *Id.* at 39-40.  He related that he was not completely sure that soldering was the cause of the blaze but did believe that somehow the soldering had caused the fire. *Id.* at 102.  He agreed that his company's insurance had lapsed at the time of the fire.  *Id.* at 105.  However, he testified that since he was being paid by the hour, he believed that the damage would be taken care of by Capital Roofing's insurance and that Kissling confirmed that was the case.  *Id.* at 71-72.

{¶ 15}  The final deponent whose testimony was filed with the trial court in connection with briefing summary judgment was Mark Kissling.  (Kissling Dep., filed Feb. 22, 2017.)  Kissling testified that he ran residential and residential-style jobs for Capital Roofing.  *Id.* at 20-23, 28-30.  He explained that he would go over numbers with Adkins before bidding a job but did not go over blueprint specifics on the jobs.  *Id.* at 34-35.  He denied that he needed Adkins approval to take a job but admitted that Adkins could override his judgment.  *Id.* at 36, 120.  He was paid according to the profit he made on jobs he supervised and, in the event of a loss, that would be deducted from his next check.  *Id.* at 35-36, 39-40, 101-02.  He received no regular wage, and he was responsible for declaring and paying his own taxes as there was no withholding.  *Id.* at 36.  He agreed that he was not separately insured.  *Id.* at 89-90.

{¶ 16}  He testified that Adkins was the one who informed him of the potential Mount Air job and was involved in the bid process, but that Adkins involvement ceased thereafter.  *Id.* at 36-38.  Kissling said that the architect only generally defined the scope of

the repair to be accomplished and that the methodology would have been up to Connell's Construction. *Id.* at 47-51. He said he met everyone at the job site on the day of the fire, April 29, 2015, to discuss what was going to be done. *Id.* at 57. The architect confirmed the desires of the client and everyone discussed the project. *Id.* at 58. Kissling admitted that he began that morning in a supervisory capacity but denied giving specific instructions on how to solder because Kevin Taylor from Connell's Construction had more experience in that area than he did. *Id.* at 115-17. He agreed that he provided copper sheets, propane cylinders, lead solder, and Ruby cleaner (to prep the metal). *Id.* at 57-58. He also agreed that, in addition to the supplies, he let Connell's Construction borrow a ladder from him. *Id.* at 93-94. However, other than those items, he said that Connell's Construction provided their own equipment, including safety equipment and torch tips. *Id.* at 59, 92-93. He confirmed there was a discussion about whether an iron without an open flame should be used but said Kevin Taylor rejected that idea due to a worry that it would not get hot enough to melt the solder. *Id.* at 60-61.

{¶ 17} At some point, Kissling left the site, and only returned after he received a telephone call informing him that the roof was on fire. *Id.* at 58. He said Brandon Connell admitted to him that Connell's Construction's insurance had lapsed due to non-payment but denied he ever indicated that Capital Roofing's insurance would take care of things. *Id.* at 76-77. He agreed that if the soldering was done properly, the roof should not have caught on fire and that he believed Connell's Construction had started the fire. *Id.* at 77, 81. But he also testified that he did not feel Connell's Construction had done anything negligent and that he could not understand how, if they started the fire working on the soffit, it had gotten so big and spread throughout the attic before they realized it. *Id.* at 77-80.

{¶ 18} The contract between Connell's Construction and Capital Roofing referred to Connell's as a "Sub-Contractor." (Ex. 3, attached to Sept. 5, 2017 State Farm Mot. for Summ. Jgmt.) But it required Connell's Construction to complete the work "per Contractor's schedule" and specifically described the job as follows:

> Remedy of six(6) copper roofs. The remedies include all copper flashing changeouts and soldering necessary to make the copper roof system perform in a watertight fashion. * * * The Subcontractor to furnish the following: All labor, tools and equipment necessary to complete project. All scaffold, ladders, perimeter warning lines, lifts and safety equipment. * * *

> Contractor is to furnish all materials to complete the roofing
> system.

(Emphasis sic.) *Id.* The contract provided for payment of $35 per man-hour spent by Connell's Construction on the project. *Id.* On the topic of contract compliance, Adkins also noted that, after the fire, Connell's Construction completed the job but the condominium association did not meet the terms of the contract fully in that, as of the date of his deposition, it had not yet paid. (Adkins Dep. at 78-79, 112.) Kissling concurred. (Kissling Dep. at 102.)

{¶ 19} Considering the evidence in the summary judgment record, the trial court granted Archatas' motion for summary judgment on October 12, 2017 recognizing the lack of expert testimony on the standard of care. (Oct. 12, 2017 Entry.) Approximately one month later, on November 7, the trial court granted the plaintiff's motions for summary judgment against Capital and denied Capital's motion. (Nov. 7, 2017 Decision & Entry.) It reasoned that despite Connell's Construction putative status as a subcontractor, Connell's Construction was an agent of Capital Roofing pursuant to a grant of authority in the contract between the two. *Id.* at 5. It accordingly found that Capital Roofing was liable for the "established negligence of its agent." *Id.* It also found that Capital Roofing had breached its contract with Mount Air insofar as it had failed to "ensure that its subcontractor's [sic] perform[] the roofing work * * * in a good and workmanlike manner." *Id.* at 6.[2]

{¶ 20} On January 12, 2018, State Farm filed a motion requesting that the decision be modified to set forth damages of $383,065.81 (broken down into $378,065.81 to State Farm and $5,000.00 to Mount Air for its deductible). (Jan 12, 2018 State Farm Mot. to Modify at 3.) State Farm also requested, by separate filing, that the trial court make explicit that its ruling also applied to claims brought by State Farm as an intervenor-party and subrogee of the insured owner of an individual condominium unit. (Jan. 12, 2018 State Farm Req. for a Ruling.) Capital Roofing and Kissling requested that the prior decision on summary judgment be set-aside and asserted a right to a jury trial. (Jan. 12, 2018 Capital Mot. to Set Aside.)

---

[2] After the grant of summary judgment, Kevin Taylor's deposition and associated exhibits were filed. (Taylor Dep., filed Jan. 4, 2018.) There is no indication that the trial court relied on that deposition in granting or denying any of the motions for summary judgment. Thus, we do not discuss it further.

{¶ 21} On January 22, 2018, the trial court issued a new decision and entry in which it listed the established damages as sought by State Farm. (Jan. 22, 2018 Decision & Entry.) As to damages, the trial court reasoned that Capital had not submitted any evidence to raise a factual dispute as to the amount of damages. *Id.* at 2-3. The trial court's ruling clarified that summary judgment was also granted to State Farm on claims brought as an intervenor-party as subrogee of the insured condominium unit owner. *Id.* at 2. However, the trial court declined to declare the decision a final judgment because some negligence claims in the action remained unresolved. *Id.* at 1-2.

{¶ 22} Shortly thereafter, State Farm, as subrogee of the condominium unit owner, dismissed direct negligence claims against Connell's Construction. (Jan. 27, 2018 Voluntary Dismissal.) Two days later, a jury trial on the remaining issues began before a magistrate of the trial court. The remaining issues stated as negligent hiring of Connell's Construction, whether Capital Roofing and Kissling retained control over the manner and means of Connell's Construction work, and whether the work was inherently dangerous. (Tr. at 8[3]; Jan. 26, 2018 State Farm Trial Brief at 3.) At trial, eight witnesses testified: Brandon Connell, Kevin Taylor, Mark Kissling, John Adkins, Scott Ruffing (the treasurer of Mount Air at the time of the project), Ken Jesenovec (the fire investigator), James Luckino (the architect), and Douglas Perry (an expert witness on roofing practices).

{¶ 23} Brandon Connell told the jury that he had a company called Connell's Construction, LLC at the time of the fire and that his father, Kevin Taylor, worked with him at Connell's Construction. (Tr. at 53-54.) Connell's Construction owned no equipment, but Brandon Connell said he personally owned some hand tools and ladders. (Tr. at 57-58.) He said it was standard in the roofing industry for workers to have at least a tool belt and a few of their own tools. (Tr. at 58-59.)

{¶ 24} Capital Roofing, through Mark Kissling, subcontracted with Connell's Construction for the repair of copper roofs on the Mount Air Job. (Tr. at 68.) The contract (plaintiff's trial exhibit 4) required Connell's Construction to supply their own tools, which they did for hand tools and perhaps a torch or two. (Tr. at 69-70) Kissling, however, provided a 40-foot specialty ladder. (Tr. at 70-71.) Kissling also provided some, but not all, of the safety equipment. (Tr. at 71-72.) Connell's Construction was paid by the hour. (Tr.

---

[3] Filed in two consecutively paginated volumes on August 24, 2018 and cited herein by page number only.

at 75.)  But, as a subcontractor, there was no exact time that Connell's Construction had to be at the site, and Connell testified that he could not remember whether he brought a four-man crew at Kissling's direction or at his own discretion.  (Tr. at 76.)  Even though he lacked experience working with solder and copper, Connell testified that he felt Connell's Construction was competent to do the job because of his father's experience and had faith that his father would show him what to do.  (Tr. at 97-98, 102.)

{¶ 25}  Connell testified that at the site, Kissling showed them how he wanted the copper pieces to be assembled and told him that the parts needed to be soldered onto the roof.  (Tr. at 80-82.)  However, Connell related that the workers already knew how to fabricate the copper pieces and that his father, not Kissling, showed him how to do the actual soldering.  (Tr. at 81-82, 97-98, 107-08.)  He said Kissling rejected his suggestion that the parts could be attached without solder, brushed aside concerns Connell had about using solder, and claimed the client had specified the solder attachment method.  (Tr. at 82-84, 88-89.)  In summation, Connell opined that Capital had a right to direct his work and that if Capital had told him to do a thing a certain way, that is how he would have done it. (Tr. at 91.)  Connell also agreed that ladders and torches are dangerous and did not dispute that the fire was an accident caused by his use of a torch.  (Tr. at 103-05, 112-14.)

{¶ 26}  Kevin Taylor testified that, on the day of the fire, April 29, 2015, he and the other workers arrived at Kissling's direction.  (Tr. at 124.)  Kissling showed them what was required regarding the copper pan fabrication on the ground.  (Tr. at 130, 137-38.)  Kissling indicated that the architect wanted the copper pieces to be soldered and rejected Connell's suggestion of pop rivets and butyl sealing.  (Tr. at 130-32.)  He agreed that if Capital had directed him to do a thing a certain way, he would have done it Capital's way.  (Tr. at 131-32.) However, he further agreed that Capital was interested only in an end product or result and opined that solder joints were the mechanically and aesthetically correct choice.  (Tr. at 151-53.)  He also expressed the view that Kissling was not there to supervise and that the expectation was that he and his coworkers would be in charge of their own work.  (Tr. at 152.)  Taylor confirmed that Kissling supplied materials, including torches, tanks, copper, and Ruby flux (to clean and prep the metal) but said it was industry standard for a roofer to supply his own tool belt with appropriate tools and acknowledged he might have brought some of his own torch heads to the job.  (Tr. at 123, 127-28, 144-45.)

{¶ 27} Taylor testified that he had done some copper soldering work before the Mount Air job, mostly box gutters. (Tr. at 118-19.) He related that a few weeks prior to the date of the fire, he, Kissling, and the architect ascended to the roof to discuss what needed to be done. (Tr. at 132-33.) He said he showed Connell how to solder and that, although Connell did not seem comfortable with it, Taylor thought him capable. (Tr. at 134.) He said the fact that the roof was already a closed roof and they were basically just adding a copper fascia added to his comfort level with Connell's participation. (Tr. at 150.)

{¶ 28} He agreed that soldering with a torch is inherently dangerous in the sense that it can cause a fire which is dangerous by nature. (Tr. at 141-42.) After the fire, in the summer, he completed the Mount Air repair work with a contained-flame soldering iron that Kissling provided to him. (Tr. at 139-41.) He denied knowing about the existence of such a tool at the time of the fire and denied being a party to a discussion about whether one should be used. (Tr. at 144.) He acknowledged that Connell's Construction had accepted responsibility for the fire. (Tr. at 138-39.)

{¶ 29} Kissling testified that he first hired Taylor and Connell through a Craigslist advertisement in 2009. (Tr. at 171-72, 236-37.) By the time of the fire, Kissling was running jobs through Capital Roofing, selling jobs for Capital Roofing, and holding himself out as an agent of Capital Roofing. (Tr. at 177-81, 188.) In that capacity, he and Adkins successfully bid the Mount Air job and subcontracted the copper work to Connell's Construction. (Tr. at 182-84, 188.) Connell's Construction, he testified, was paid as it was bid, at an hourly rate. (Tr. at 184-85, 192.) He said that the timing of the copper job was dictated by the weather, the preferences of the client, progress on other portions project, and the other jobs in which Connell's Construction may have been engaged at the time. (Tr. at 190-92.) Although Kissling admitted to instructing Connell's Construction on the scope of the work—in essence, to box the soffit with copper and solder the joints—he denied giving specific direction as to how the work should be completed. (Tr. at 193-94, 202, 228-29, 258.) Kissling provided disposable materials for the job and also agreed that he lent his ladder to Connell's Construction. (Tr. at 196-97, 243.)

{¶ 30} Kissling testified that he generally hires subcontractors based on quality, timeliness, professionalism, and ability to follow directions. (Tr. at 221.) He was satisfied, at the time when he hired Connell's Construction, with Taylor's experience level. (Tr. at

221-23.)  He was not concerned about Connell's relative youth and inexperience because Taylor had done excellent copper work on a big job for a church and had shown good judgment in what tasks he delegated to Connell.  (Tr. at 223.)  Even though Connell was the nominal owner of Connell's Construction, Kissling testified that Taylor was the expert and always the person with whom he dealt.  *Id.*  Because of that experience, when he broached the notion of using a contained flame soldering iron rather than a torch and Taylor opined that the indirect flame would not get hot enough to do the job, he deferred to Taylor's superior experience.  (Tr. at 224-25, 244.)  If Taylor had wanted to use a contained flame iron, he would have procured one and taken the cost from Connell's Construction pay at the end of the job.  (Tr. at 225-27.)  In the end, he said, when Taylor finished the job in August after the fire, he procured such a tool for Taylor's use.  (Tr. at 204-05, 237.)

{¶ 31}  Like the other witnesses, Kissling agreed that open flames and tall ladders have certain risks.  (Tr. at 196, 201.)

{¶ 32}  Adkins testified that he started Capital Roofing in 2009 and had always been the sole owner and employee.  (Tr. at 303-04.)  All the actual physical roofing work for his company was done by subcontracting.  (Tr. at 305-06.)  When his friend, Kissling, fell on hard times in 2013, he permitted him to run jobs through Capital Roofing.  (Tr. at 306-07.)  He acknowledged that, at the time of the Mount Air job, Kissling was an agent of Capital Roofing.  (Tr. at 345.)  He agreed that Connell's Construction was paid hourly, that Capital Roofing generally would approve the work of any subcontractor it hired, and that Capital Roofing maintained control of the job site to a point.  (Tr. at 324-25.)  However, he maintained that Connell's Construction was a subcontractor under the contract introduced as plaintiff's exhibit 4, and that, consistent with that relationship, Capital Roofing supplied the materials for the job and gave instructions on the scope as relayed by the architect but did not direct that the job be accomplished a certain way.  (Tr. at 314, 317-18, 339-40.)  Indeed, when Kissling suggested that Taylor use a contained flame soldering iron rather than an open-flame torch, and Taylor indicated he would use the torch because the iron would not get hot enough, Kissling (as Capital Roofing's agent) did not direct Taylor to perform the work using the iron.  (Tr. at 341.)

{¶ 33}  Adkins explained that he has extensive roofing experience and had enjoyed an over-20-year relationship with the architect of the Mount Air job.  (Tr. at 303, 305.)  He

said he had no hesitation or misgivings in hiring Connell's Construction as Taylor was the expert in metal work despite Connell's nominal status as president of Connell's Construction. (Tr. at 323, 339-40, 347-48.) Taylor, for example, had done exceptional copper work for Adkins in the past on a $200,000 to $300,000 job for a church. (Tr. at 339-40.) Despite this, Adkins said he was of the opinion that Connell's Construction was to blame for the fire and that no one who worked for Capital Roofing was responsible. (Tr. at 325-26, 330-31.)

{¶ 34} Like the other witnesses, Adkins admitted that an open flame can be dangerous. (Tr. at 333.)

{¶ 35} The treasurer of Mount Air also testified. (Tr. at 262.) He testified that, by trade, he was a software engineer with no roofing experience. (Tr. at 264.) The condominium board selected Capital Roofing for the job based on a bid process, a pre-bid meeting, and discussions with the architect. (Tr. at 265-68, 279-80.) He testified that he had no involvement in discussions or decisions about how the needed repairs would be accomplished. (Tr. at 273.)

{¶ 36} The investigator for the City of Columbus Division of Fire who evaluated the Mount Air blaze testified next. (Tr. at 287, 289.) He testified that he examined the building after the fire was out and spoke to all the workers who were present. (Tr. at 291-93.) He determined that the fire started at the roof level and burned down into the attic. (Tr. at 293.) He concluded, in the absence of any other ignition sources, that the heat of the lead solder work on the roof had started the fire and classified the cause as accidental. (Tr. at 294, 296-97.)

{¶ 37} The architect on the job also testified. He testified that he was retained by Mount Air to access their roof for leaks and design a fix. (Tr. at 392-94.) He mentioned Capital Roofing and some other firms to Mount Air as potential firms from which to solicit bids and acknowledged that he had a long and excellent relationship with Adkins and thought highly of his skills. (Tr. at 395-96.) Though he said he was unable to precisely define the relationship, he confirmed that Kissling had long been associated with Adkins. (Tr. at 397.) He also stated that he was familiar with Connell's Construction, considered them experts in sheet metal roofing work, and testified that Taylor had done copper soldering work for him in the past with "more than satisfactory" results. (Tr. at 397-99,

403.)  He testified that he was aware that Capital Roofing had no employees and would use subcontractors to accomplish the physical work involved in the project.  (Tr. at 409-10.)  He stated that he made no recommendations or instructions on how to repair the roofing because that was a means/method choice and was up to the contractor to determine.  (Tr. at 405-06.)

{¶ 38}  The final witness to testify was Douglas Perry, whom Adkins characterized as a competitor.  (Tr. at 342, 351.)  Perry testified that he owns Allied Roofing Incorporated and was hired as an expert based on his extensive background in commercial roofing.  (Tr. at 351-67.)  He said that in the industry, subcontractors work at the direction of the contractor whose representative is usually present at the start of the project to answer questions that arise.  (Tr. at 368-69.)  Contractors, he explained, supply materials—but never tools.  (Tr. at 370.)

{¶ 39}  He stated that his firm does copper work with a torch from time to time but that using a torch to solder on wood decking is inappropriate as it gets much too hot.  (Tr. at 370-71, 375-77.)  A contained-flame soldering iron is what should be used in such circumstances.  (Tr. at 375.)  While he declined to say that using an open-flame torch on wood decking was "inherently dangerous," he opined that any use of an open flame is dangerous, and use of an open flame with wood in proximity is not standard practice in the industry.  (Tr. at 377, 384.)  He stated that with Taylor's and Connell's level of experience, he would not have used them for the copper job.  (Tr. at 374.)

{¶ 40}  At the close of the evidence, State Farm moved for a directed verdict "on the inherently dangerous non-delegable duty aspect of th[e] case," noting that all the witnesses that were asked about it agreed that using the torch was a dangerous activity.  (Tr. at 427.)  The magistrate overruled the motion on the grounds that the degree of the risk and the nature of precautions taken were factual issues for the jury to resolve.  (Tr. at 434-36.)  After deliberating, the jury provided a negative answer to three interrogatories:

> Did Defendants 'negligently hire or supervise' Connell Construction to perform the copper portion of the roof work?

> Did Defendants reserve the right to maintain control over the 'manner and means' of Connell performing the copper portion of the roof work?

> Do you find that the use of an open flame propane torch in soldering copper to the Mount Air Condominium roof is an inherently dangerous or ultra-hazardous[4] activity?

(Feb. 1, 2018 Jury Interrogs.)  Five days later, the magistrate of the trial court issued a decision duly memorializing the jury's verdict.  (Feb. 6, 2018 Mag. Decision.)

{¶ 41} State Farm filed objections on February 19 and then supplemented the objections on April 6, after the transcript was produced.  (Feb. 19, 2018 Objs.; Apr. 6, 2018 Suppl. Objs.)  State Farm argued that the magistrate erred in accepting the jury's decisions on each of the interrogatories because the magistrate had made errors of law in overruling the motion for a directed verdict and the evidence presented at trial had shown the opposite of what the jury found as to each interrogatory.  (Apr. 6, 2018 Suppl. Objs. at 2-15.)  Capital responded that the objections only criticized the magistrate's judgment insofar as they challenged the directed verdict ruling; otherwise, they merely sought for the trial court to substitute its opinion for the jury's verdict in the manner of judgment notwithstanding the verdict.  (May 3, 2018 Capital Memo. Contra at 1-2.)  With respect to the magistrate's ruling on the directed verdict, Capital argued that the magistrate was correct to leave the matter to the jury because even State Farm's expert declined to opine that use of a torch was "inherently dangerous" and there were questions of fact for the jury to determine.  *Id.* at 2-7.

{¶ 42} In a decision issued on July 10, 2018, the trial court overruled each of State Farm's objections.  (July 10, 2018 Decision & Entry.)  The trial court reasoned that the magistrate had properly applied the directed verdict standard in denying the directed verdict after finding conflicts in the evidence.  *Id.* at 6-7.  It found, using a judgment notwithstanding the verdict standard, that construing the evidence in Capital's favor, reasonable minds could have reached the conclusions the jurors reached on each of the three interrogatories.  *Id.* at 8-10.

{¶ 43} On August 15, 2018, the trial court entered judgment in favor of Capital Roofing and Kissling "on the claims encompassed by the jury verdict."  (Aug. 15, 2018 Jgmt.

---

[4] Some courts have drawn a distinction between activities that are inherently dangerous and ultra-hazardous. *See, e.g.*, *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222, 234-35 (1991).  However, despite this separate mention in the interrogatories, the parties have essentially treated the concepts interchangeably, arguing primarily about whether the solder activities at issue were inherently dangerous.  Thus, our discussion is confined to inherent dangerousness.

Entry at 1.)  Simultaneously, it merged the decisions on final judgment into the final order and entered judgment in favor of State Farm (as subrogee of Mount Air) against Capital for $378,065.81, in favor of Mount Air against Capital for $5,000.00, and in favor of State Farm (as subrogee of the individual unit owner) for $79,949.52.  *Id.* at 1-2.

{¶ 44}  All parties now appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 45}  Capital assigns four alleged errors for review:

> 1. The trial court erred as a matter of law in relying on a default judgment against a co-defendant to find Capital Roofing liable based on respondeat superior.
>
> 2. The trial court erred in granting summary judgment to plaintiffs on their negligence claims.
>
> 3. The trial court erred in granting summary judgment on the plaintiffs' breach of contract claims.
>
> 4. The trial court erred in granting summary judgment to the plaintiffs as to damages.

{¶ 46}  State Farm alleges three errors for consideration:

> [1.]    THE TRIAL COURT ERRED IN DENYING STATE FARM'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT WITH REGARD TO THEIR CLAIM OF VICARIOUS LIABILITY BASED UPON AN AGENCY RELATIONSHIP.
>
> [2.]    THE TRIAL COURT ERRED IN DENYING STATE FARM'S MOTION FOR DIRECTED VERDICT AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT WITH REGARD TO THEIR CLAIM OF VICARIOUS LIABILITY BASED UPON THE NON-DELEGABLE DUTY DOCTRINE.
>
> [3.]    THE TRIAL COURT ERRED IN DENYING STATE FARM'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT WITH REGARD TO THEIR CLAIM OF NEGLIGENT    HIRING,    RETENTION    AND/OR SUPERVISION.

{¶ 47}  For clarity, we address Capital's assignments of error regarding summary judgment first.

## III. DISCUSSION

### A. Summary Judgment Standard for Capital's Appeal

{¶ 48} Civ.R. 56(C) provides that:

> Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The Supreme Court of Ohio has explained:

> Summary judgment will be granted only when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C); *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 Ohio Op. 3d 466, 364 N.E.2d 267. The burden of showing that no genuine issue of material fact exists falls upon the party who files for summary judgment. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 294, 1996 Ohio 107, 662 N.E.2d 264.

*Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, ¶ 10; *see also, e.g., Esber Beverage Co. v. Labatt United States Operating Co., L.L.C.*, 138 Ohio St.3d 71, 2013-Ohio-4544, ¶ 9.

{¶ 49} The Supreme Court has also discussed in detail the relative burdens of movant and nonmovant:

> [A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a

> genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.

*Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). Though this is phrased as if the nonmoving party were the plaintiff, it is equally applicable where, as here, the plaintiff is the movant. In such a case, the plaintiff must introduce evidence of the sort contemplated in Civ.R. 56(C) and (E) to show that "there is no genuine issue as to any material fact" as to each "essential element" of the plaintiff's claim and that, on the basis of those undisputed facts, it is "entitled to judgment as a matter of law." Civ.R. 56; *Dresher* at 293; *see, e.g.*, *Pentad Joint Venture v. First Natl. Bank*, 797 S.W.2d 92, 95 (Tex.Ct.App.1990). Whereupon, the burden shifts to the nonmoving defendant to respond with specific facts showing there is a genuine issue for trial. *Dresher* at 293.

{¶ 50} In deciding summary judgment, the trial court must give the nonmoving party "the benefit of all favorable inferences when evidence is reviewed for the existence of genuine issues of material facts." *Byrd* at ¶ 25. When reviewing a trial court's decision on summary judgment, our review is de novo and we therefore apply the same standards as the trial court. *Bonacorsi v. Wheeling & Lake Erie Ry.*, 95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 24. In addition, in situations where an item of evidence was not available to the trial court at the time it made the decision being appealed, such evidence cannot be considered.

> Appellate review is limited to the record as it existed at the time the trial court rendered its judgment. *Fifth Third Bank v. Financial S. Office Partners, Ltd.*, 2d Dist. No. 23762, 2010 Ohio 5638; *Cunningham v. Cunningham*, 5th Dist. No. 09-CA-25, 2010 Ohio 1397, ¶ 65; *Paasewe v. Wendy Thomas 5 Ltd.*, 10th Dist. No. 09AP-510, 2009 Ohio 6852, ¶ 15. *See also UAP-Columbus JV326132 v. Young*, 10th Dist. No. 09AP-646, 2010 Ohio 485, ¶ 32 ("Our review of summary judgment is limited solely to the evidence that was before the trial court at the time of its decision."). " 'A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter.' " *Morgan v. Eads*, 104 Ohio St.3d 142, 2004 Ohio 6110, ¶ 13, 818 N.E.2d 1157 (quoting *State v. Ishmail* (1978), 54 Ohio St.2d 402, 377 N.E.2d 500, paragraph one of the syllabus). Likewise, "a reviewing court cannot consider evidence that a party added to the trial court record after that court's judgment, and then decide an appeal from the judgment

> based on the new evidence." *Paasewe* at ¶ 15. *See also Wallace v. Mantych Metalworking*, 189 Ohio App.3d 25, 2010 Ohio 3765, ¶ 10-11, 937 N.E.2d 177 (refusing to consider a deposition filed with the trial court after the court rendered the judgment being appealed); *Waterford Tower Condominium Assn. v. TransAmerica Real Estate Group*, 10th Dist. No. 05AP-593, 2006 Ohio 508, ¶ 13 (refusing to consider evidence adduced to support a motion for reconsideration when reviewing the underlying judgment).

*Wiltz v. Clark Schaefer Hackett & Co.*, 10th Dist. No. 11AP-64, 2011-Ohio-5616, ¶ 13. Thus, for the purposes of de novo consideration of the trial court's summary judgment decision, we rely only upon the exhibits and depositions that were filed with the trial court prior to the time of the decision.

1. **Capital's First and Second Assignments of Error – Whether the Trial Court Erred in Granting Summary Judgment Against Capital on Negligence Claims**

{¶ 51} Capital advances essentially two arguments in support of these related assignments of error: first, that Connell's Construction default cannot serve as a basis for establishing negligence on which to base vicarious liability on the part of Capital; second, that Connell's Construction was an independent contractor of Capital Roofing, not an employee or agent, and thus there is no vicarious liability. *See, e.g.*, Jan 16, 2019 Capital's Brief at 13-15. As we conclude that the second argument decides the matter, we find it unnecessary to address the first.

{¶ 52} The Supreme Court has explained how vicarious liability is to be imposed:

> "[I]t is a fundamental maxim of law that a person cannot be held liable, other than derivatively, for another's negligence. * * * [T]he most common form of derivative or vicarious liability is that imposed by the law of agency, through the doctrine of respondeat superior." This doctrine of liability depends on the existence of control by a principal (or master) over an agent (or servant), terms that we have used interchangeably.

(Citations omitted.) *Natl. Union Fire Ins. Co. v. Wuerth*, 122 Ohio St.3d 594, 2009-Ohio-3601, ¶ 20, quoting *Albain v. Flower Hosp.*, 50 Ohio St.3d 251, 255 (1990), citing *Hanson v. Kynast*, 24 Ohio St.3d 171, 173 (1986). As the High Court stated on another occasion, "[g]enerally, an employer or principal is vicariously liable for the torts of its employees or agents under the doctrine of respondeat superior, but not for the negligence of an

independent contractor over whom it retained no right to control the mode and manner of doing the contracted-for work." *Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435, 438 (1994), citing *Councell v. Douglas*, 163 Ohio St. 292, 295-96 (1955).

**{¶ 53}** In this case, the trial court concluded that Connell's Construction (and presumably Brandon Connell) was an agent of Capital Roofing.  (Nov. 7, 2017 Decision & Entry at 4-5.)  It reasoned that because the contract between Capital Roofing and Connell's Construction (despite denominating Connell's Construction a "sub-contractor") constituted an "express grant of authority" an agency relationship was created.  *Id.* at 5.  It found that the instruction to repair the copper roofs was just such a grant of authority.  *Id.*

**{¶ 54}** It is true, as the trial court noted, that in considering whether an agency relationship has been created, courts have focused on whether there was an express grant of authority.  *Id.,* quoting *Master Consol. Corp. v. Bancohio Natl. Bank*, 61 Ohio St.3d 570, 574 (1991).  But independent contractors are also empowered to achieve certain ends for those employers with whom they are contracted.  The difference between an agent/servant and an independent contractor is not whether they have been granted authority to achieve an end desired by the principle/master/employer but in the degree of control exercised by the principle/master/employer.  As the Supreme Court classically opined:

> "The relation of principal and agent or master and servant is distinguished from the relation of employer and independent contractor by the following test: Did the employer retain control, or the right to control, the mode and manner of doing the work contracted for? If he did, the relation is that of principal and agent or master and servant. If he did not but is interested merely in the ultimate result to be accomplished, the relation is that of employer and independent contractor."

*Councell* at 295, quoting *Miller v. Metro. Life Ins. Co.*, 134 Ohio St. 289, 291-92 (1938); *see also Pusey v. Bator*, 94 Ohio St.3d 275, 278-79 (Feb. 27, 2002), quoting *Bobik v. Indus. Comm.*, 146 Ohio St. 187 (1946), paragraph one of the syllabus (" 'The chief test in determining whether one is an employee or an independent contractor is the right to control the manner or means of performing the work.' ").  This fact-weighing analysis is normally an issue suited for resolution at trial.  For example, in the context of workers' compensation, the Supreme Court has stated, "Whether someone is an employee or an independent contractor is ordinarily an issue to be decided by the trier of fact. The key factual determination is who had the right to control the manner or means of doing the

work." *Bostic v. Connor*, 37 Ohio St.3d 144 (1988), paragraph one of the syllabus. In this case, not only did the trial court in its summary judgment decision determine the issue such that Capital was vicariously liable, the trial court also did not undertake the necessary analysis of the degree of control Capital retained over how Connell's Construction accomplished the requested work.

{¶ 55} There is no dispute that the contract between Connell's Construction and Capital Roofing referred to Connell's Construction as a "Sub-Contractor" and required Connell's Construction to "[r]emedy of six(6) copper roofs * * * to make the copper roof system perform in a watertight fashion," "per Contractor's schedule." (Ex. 3, attached to Sept. 5, 2017 State Farm Mot. for Summ. Jgmt.) There is also no dispute that the contract provided for payment of $35 per man-hour spent by Connell's Construction on the project. *Id.* Yet, our de novo review of the summary judgment record reflects a considerable difference of opinion between Connell, Kissling, and Adkins about to what degree Capital Roofing retained the ability to direct *how* Connell's Construction achieved the result of repairing the copper roofs.

{¶ 56} Adkins opined that subcontractors are not told how to do a job—they are merely provided with materials and a deadline. (Adkins Dep. at 81, 115-16.) He stated that he did not tell Connell's Construction how to do the job in this case. *Id.* at 81, 110-11, 115-16.

{¶ 57} Kissling said that the architect only generally defined scope of the repair to be accomplished and that the methodology would have been up to Connell's Construction. (Kissling Dep. at 47-51.) Kissling admitted that he began the morning of the fire in a supervisory capacity but denied giving specific instructions on how to solder because Taylor from Connell's Construction had more experience in that area than he did. *Id.* at 115-17. He also explained that when Taylor stated that he preferred to use an open flame for the job, he did not attempt to control his choice of tool. *Id.* at 60-61. He agreed that he provided supplies including copper sheets, propane cylinders, lead solder, and Ruby cleaner. *Id.* at 57-58. He also agreed that, in addition to the supplies, he let Connell's Construction borrow a ladder from him. *Id.* at 93-94. However, other than those items, he said that Connell's Construction provided their own equipment, including safety equipment and torch tips. *Id.* at 59, 92.

{¶ 58} Connell testified that that he was not given plans or blueprints for the work; rather, Kissling specified a crew of four and met Connell and the three other workers at the job site to tell them how he wanted things done.  (Connell Dep. at 51, 56-57, 90.)  According to Connell, Kissling told them what to do, how to do it, and provided all tools and equipment (including a ladder, torches, tanks, and safety equipment), though Connell also agreed he brought his own hand tools and a fire extinguisher.  *Id.* at 52-54, 91-94.  Kissling showed them what to do with the copper pieces both on the roof and on the ground but did not demonstrate the particular soldering technique.  *Id.* at 57, 61, 117.  Connell said it was Kissling, however, who vetoed a suggestion by Connell and his father, Taylor, that they obtain and use a soldering iron with a contained flame and that Kissling also rejected a suggestion by Connell that the copper be riveted and sealed rather than soldered. *Id.* at 40-41, 111-12.

{¶ 59} In short, Adkins, Kissling, and Connell gave factually conflicting accounts in their depositions of the extent to which Capital Roofing controlled Connell's Construction. In Brandon Connell's view, it was Kissling (an agent of Capital Roofing), who provided tools and told them how to do the copper, putting pieces together on the ground and getting up on the roof to show them how to apply the copper.  In Kissling's view, he provided materials (but no tools) and merely lent Connell's Construction a ladder.  He told the roofers what the client wanted but did not stay to supervise or direct the work.  In Adkins view, as sole principle of Capital Roofing, he never had any employees and did not tell Kissling or Connell's Construction how to apply the copper or seek to control their work in any way.  In this scenario, the only way to decide if Connell's Construction and Brandon Connell were agents/employees or independent contractors of Capital Roofing was to weigh the testimony of those three individuals and decide who was the more credible in describing the relationship.  But that is not a task that could have been accomplished on summary judgment.

{¶ 60} We therefore sustain Capital's second assignment of error.  Capital's first assignment of error is moot.

### 2. Capital's Third Assignment of Error – Whether the Trial Court Erred in Granting Summary Judgment Against Capital for Breach of Contract

{¶ 61} Capital argues that the summary judgment record disclosed at least a question of fact as to whether Capital Roofing breached its contract with Mount Air. "In general, the essential elements of a cause of action for breach of contract are [1] the existence of a contract, [2] performance by the plaintiff, [3] breach by the defendant and [4] resulting damage to the plaintiff." (Internal quotation marks omitted and bracketed numbers added.) *ABLE Roofing v. Pingue*, 10th Dist. No. 10AP-404, 2011-Ohio-2868, ¶ 20, quoting *Winner Bros., LLC v. Seitz Elec., Inc.*, 182 Ohio App.3d 388, 2009-Ohio-2316, ¶ 31 (2d Dist.); *Flaim v. Med. College of Ohio*, 10th Dist. No. 04AP-1131, 2005-Ohio-1515, ¶ 12.

{¶ 62} In this case, there is no dispute in the record that the condominium suffered damage from the fire and that there was a contract between Mount Air and Capital Roofing. With respect to the second element, State Farm never pled that Mount Air had fulfilled its obligations under the contract. Adkins and Kissling both testified in their depositions that Mount Air had not complied with its responsibilities under the contract because, as of the dates of their depositions, it had not yet paid for the copper work that was completed to satisfaction after the fire. (Apr. 28, 2017 State Farm's Second Am. Compl.; May 23, 2016 State Farm's First Am. Compl.; May 18, 2016 State Farm's Compl; Adkins Dep. at 112; Kissling Dep. at 102.) However, during oral argument, Capital expressly admitted through counsel that there was "never any real dispute that Mount Air performed its obligations under the contract." (Aug. 14, 2019 Oral Argument at 10:29:10-32.) Thus, although there may have been some question of fact in the summary judgment record, Capital appears now to have waived any dispute as to the second element. Thus, all that is now before this Court is the third element, whether Capital Roofing breached the contract and what measure of damages is appropriate for that breach.

{¶ 63} In general, a " ' "[b]reach," as applied to contracts is defined as a failure without legal excuse to perform any promise which forms a whole or part of a contract, including the refusal of a party to recognize the existence of the contract or the doing of something inconsistent with its existence.' " *Hanna v. Groom*, 10th Dist. No. 07AP-502, 2008-Ohio-765, ¶ 14, quoting *Natl. City Bank of Cleveland v. Erskine & Sons*, 158 Ohio St. 450 (1953), paragraph one of the syllabus. In this case, the contract between Mount Air

and Capital Roofing required Capital Roofing to execute certain copper roofing repairs as follows:

Copper Repairs

- Investigation demolition

- Repairs for time and materials basis

- Copper materials and standing seam panels provided by metal fabrication shop

    o Raw material invoices at cost plus 20% markup

    o Shop fabrication at $100/hour, not including delivery

    o Materials and fabrication costs invoiced on weekly basis due in 30 days

- Labor costs billed at $65 per man hour on weekly basis due in 30 days

- All repair work at direction of architect/owner in written form

(Ex. 2, attached to Sept. 5, 2017 State Farm Mot. for Summ. Jgmt.)

**{¶ 64}** The specific breach complained of in this case is not of any one of the particular terms but, rather, that Capital Roofing failed to repair the copper roof in a "workmanlike" manner. Although the contract between Capital Roofing and Mount Air does not specifically state what is the agreed-to quality of work, the Supreme Court has made clear that to construct and repair in a "workmanlike" manner is a duty imposed by law regardless of the particular contract terms. *Jones v. Centex Homes*, 132 Ohio St.3d 1, 2012-Ohio-1001, ¶ 12-14. "Workmanlike manner is a standard that requires a construction professional to act reasonably and to exercise that degree of care which a member of the construction trade in good standing in that community would exercise under the same or similar circumstances." *Seff v. Davis*, 10th Dist. No. 03AP-159, 2003-Ohio-7029, ¶ 19. The failure to meet that duty may constitute a breach of contract. *Hanna* at ¶ 18-19.

**{¶ 65}** The summary judgment record in this case does not reveal a genuine dispute about whether Capital Roofing repaired the copper in a workmanlike manner. It shows that Capital Roofing contracted with Connell's Construction at a rate of $35 per hour to

fulfill its obligations—in essence, to "[r]emedy of six(6) copper roofs * * * to make the copper roof system perform in a watertight fashion," "per Contractor's schedule."  (Ex. 3, attached to Sept. 5, 2017 State Farm Mot. for Summ. Jgmt.)   Thus, whether Connell's Construction was an employee/agent or an independent sub-contractor, there is no dispute that Capital Roofing was contractually obliged to complete the repair of the Mount Air condominium and that Connell's Construction undertook the repair at Capital Roofing's behest in order to fulfill that obligation.   There is also no serious dispute that rather than correctly repairing the roof, Connell's Construction set the building on fire.   (Connell Dep. at 99-102; Kissling Dep. 77, 81.)   Under the undisputed facts here, setting the roof on fire in the course of repairing was not completing roof repair in a "workmanlike" manner.  *Seff* at ¶ 19; *see also Fullenkamp v. Homan, Inc.*, 3d Dist. No. 10-05-16, 2006-Ohio-4191, ¶ 12 (noting that expert testimony as to the industry standard of care is not necessary when the issue is not highly technical or scientific in nature or beyond the experience or knowledge of the average trier of fact).   And we observe that Capital's own pleadings go farther, alleging that Connell's Construction work was negligent. *See* Aug. 8, 2016 Capital's Cross-Claim at ¶ 1.

{¶ 66}  We overrule Capital's third assignment of error.

### 3. Capital's Fourth Assignment of Error – Whether Proper Damages were Awarded

{¶ 67}  We have previously discussed the appropriate measure of damages in cases where a contractor fails to construct in a "workmanlike" manner:

> This court has recognized that the common law "imposes a duty upon contractors and builders to perform in a workmanlike manner." *Custer v. Commercial Builders & Floor Coverings* (Sept. 26, 1989), 10th Dist. No. 89AP-117, 1989 Ohio App. LEXIS 3739. The measure of damages in such a case is "the cost to repair defects to the extent necessary to place the nonbreaching party in the position contemplated by the parties at the time of entering into the contract," i.e., "the measure of damages is determined by 'cost of correction.' " *Id. See also Landis v. William Fannin Builders, Inc.*, 193 Ohio App. 3d 318, 2011 Ohio 1489, ¶ 31, 951 N.E.2d 1078 ("Generally, the appropriate measure of damages in an action for a breach of a construction contract is the cost to repair the deficient work; that is, the cost of placing the building in the condition contemplated by the parties at the time they entered into the contract").

*Pingue*, 2011-Ohio-2868, at ¶ 20.

{¶ 68} In this case, Capital and Connell's Construction finished repairing the roof after the building was restored following the fire. (Adkins Dep. at 78-79; Connell Dep. at 67-68, 76-77.) This placed the building in the position the parties had contemplated before the contract (i.e., the roof was repaired and the building was intact). The only extent to which the condominium association and its constituent owners were not in the same position was insofar as they (and their insurer, State Farm) were required to pay to repair the fire damages. State Farm submitted an affidavit supported by claim documents as evidence of the amount of such damages. (Mendum Aff.; Exs. 4, 5, attached to Sept. 5, 2017 State Farm Mot. for Summ. Jgmt.) Capital completely failed to submit any materials of the type contemplated by Civ.R. 56 on the topic of damages. Consequently, we do not see that any genuine issue of material fact remained as to damages.

{¶ 69} We overrule Capital's fourth assignment of error.

## B. Judgment Notwithstanding the Verdict and Directed Verdict Standards for Evaluating State Farm's Assignments of Error

{¶ 70} The Supreme Court has set forth the standard for reviewing decisions on motions for directed verdict:

> Because the trial court's decision to grant a motion for a directed verdict involves a question of law, our review is *de novo. Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St. 3d 512, 2002 Ohio 2842, ¶ 4, 769 N.E.2d 835. As we explained in *Goodyear Tire*, "a motion for directed verdict is granted if, after construing the evidence most strongly in favor of the party against whom the motion is directed, 'reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party.' The 'reasonable minds' test mandated by Civ.R. 50(A)(4) requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party." *Id.* at ¶ 3, quoting Civ.R. 50(A)(4).

*White v. Leimbach*, 131 Ohio St.3d 21, 2011-Ohio-6238, ¶ 22.

{¶ 71} The standard is similar for considering an appeal on the issue of whether judgment notwithstanding the verdict ("JNOV") should have been granted. In such cases, we must consider whether the evidence, "construed most strongly in favor of" the party against whom JNOV was contemplated, was "legally sufficient to sustain the verdict" rendered at trial. *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 119

Ohio St.3d 209, 2008-Ohio-3833, ¶ 23, citing *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986); *see also Link v. FirstEnergy Corp.*, 147 Ohio St.3d 285, 2016-Ohio-5083, ¶ 22. If so, the trial verdict must stand. This is a question of law, and we review it de novo. *Environmental Network* at ¶ 23, citing *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108 (1995).

   1. **State Farm's First Assignment of Error – Whether the Trial Court Erred in Declining to Find an Agency Relationship Notwithstanding the Jury's Verdict**

{¶ 72} State Farm argues that the testimony at trial showed that Connell's Construction was paid by the hour, supplied only labor, felt beholden to respect Capital's wishes about how the work was to be accomplished, and actually acquiesced to Capital's wishes in affixing the copper with lead solder rather than pop fasteners and butyl sealant. (Jan. 16, 2019 State Farm's Brief at 16-19.) Our review of the transcript shows evidence was introduced at trial that could have supported each of these contentions. *See supra* at ¶ 23-39. But State Farm was only entitled to JNOV if, construing all inferences in Capital's favor, the evidence was insufficient to sustain the jury's verdict in Capital's favor. *Link* at ¶ 22. We find that, construing the evidence in Capital's favor, there was another version of the relationship between the parties that the jury could reasonably have chosen to believe.

{¶ 73} For example, both Kissling and Adkins were consistent in maintaining that Capital Roofing's control of the project was limited to setting the scope of the project—not directing the means or course of the work. (Tr. at 191-95, 222-25, 258, 324-26, 338-39.) And even Taylor testified at times in ways that agreed with the notion that Capital Roofing was interested in the result, not the methods. (Tr. at 151-52.) Connell admitted that, as a subcontractor, there was no exact time he had to be at the job site, that he already knew how to assemble the copper pans, and that Taylor, not Kissling, showed him how to solder the copper pieces to the roof. (Tr. at 74, 80-82, 107-08.) There was also testimony that the requirement of lead solder was a project scope specification of the architect and the client and that solder was the right choice under the circumstances. (Tr. at 82-84, 152-53, 228-29.) Most witnesses also agreed that, though Connell's Construction was permitted to borrow Kissling's ladder, the workers provided their own tools and Capital Roofing only supplied consumables such as copper, lead solder bars, and Ruby cleaner. (Tr. at 58-59, 69-70, 123, 127-28, 196-97, 340.) Thus, there was also evidence tending to support the

notion that Capital Roofing was interested in the result—soldered repair of copper roofing—rather than the particular means by which it was accomplished.  *See Wuerth*, 2009-Ohio-3601, at ¶ 20; *Councell*, 163 Ohio St. at 295.

{¶ 74}  In short, as with most triable issues, there was evidence available to support more than one conclusion.  The jury weighed the testimony and reached its conclusion.  This is not a situation in which JNOV would have been appropriate, and the trial court therefore did not err in overruling State Farm's objections to the verdict (as memorialized by the magistrate).

{¶ 75}  We overrule State Farm's first assignment of error.

2. **State Farm's Second Assignment of Error – Whether the Trial Court Erred in Denying a Motion for a Directed Verdict and Refusing to Grant Judgment Notwithstanding the Verdict on the Issue of a Non-Delegable Duty**

{¶ 76}  The Supreme Court has made clear:

> [A]n employer is generally not liable for the negligent acts of an independent contractor. There are, however, exceptions to this general rule, several of which stem from the nondelegable duty doctrine. Nondelegable duties arise in various situations that generally fall into two categories: (1) affirmative duties that are imposed on the employer by statute, contract, franchise, charter, or common law and (2) duties imposed on the employer that arise out of the work itself because its performance creates dangers to others, i.e., inherently dangerous work. Prosser & Keeton, *The Law of Torts* (5 Ed. 1984) 511-512, Section 71; *Albain * * *,* 50 Ohio St.3d [at] 260-261 * * * . If the work to be performed fits into one of these two categories, the employer may delegate the work to an independent contractor, but he cannot delegate the duty. In other words, the employer is not insulated from liability if the independent contractor's negligence results in a breach of the duty.

*Pusey*, 94 Ohio St.3d at 279.  Here, there is no allegation that any non-delegable duty was imposed by contract, statute, or other written source; thus, the question is whether the activity for which Capital Roofing was hired and which Capital Roofing subcontracted to Connell's Construction, was "inherently dangerous work" such that Capital should be vicariously liable for the harm to third parties (State Farm and Mount Air) caused by Connell's Construction.

{¶ 77}  We have previously explained:

> The Supreme Court of Ohio has stated that "[a] construction site is inherently a dangerous setting." *Bond v. Howard Corp.* (1995), 72 Ohio St.3d 332, 336, 1995 Ohio 81, 650 N.E.2d 416. The Supreme Court of Ohio has further stated that "a subcontractor who works at a construction site is engaged in inherently dangerous work." *Michaels v. Ford Motor Co.* (1995), 72 Ohio St.3d 475, 479, fn. 4, 1995 Ohio 142, 650 N.E.2d 1352. Moreover, this court previously has found that "[i]t is well-settled that a construction site is an inherently dangerous work environment. * * * In addition, a subcontractor who works at a construction site is engaged in inherently dangerous work." *Collier v. Borror Corp.* (Nov. 5, 1998), Franklin App. No. 97APE12-1624, 1998 Ohio App. LEXIS 5384, 1998 WL 767324; *see, also, McClary v. M/I Schottenstein Homes, Inc.*, Franklin App. No. 03AP-777, 2004 Ohio 7047, at P58, 2004 WL 2980561.

*Cole v. Contract Framing, Inc.*, 162 Ohio App.3d 612, 2005-Ohio-4244, ¶ 28 (10th Dist.). Roofing and high ladders may also qualify as "inherently dangerous." *Hackney v. Ward*, 2d Dist. No. 26175, 2014-Ohio-4413, ¶ 14; *Alapi v. Colony Roofing, Inc.*, 8th Dist. No. 83755, 2004-Ohio-3288, ¶ 33.

{¶ 78} However, we have also recognized that while construction and roofing are generally inherently dangerous to the *employees* engaged in the work, the same is not necessarily true *as to third parties*; in essence, we have noted that roofing work is dangerous to the roofer (who could fall) but not inherently to third parties. *Moore v. Ohio Dept. of Rehab. & Corr.*, 89 Ohio App.3d 107, 111 (10th Dist.1993). We have also recognized, "[t]he inherently-dangerous-work exception applies only to dangerous work and does not extend to proper work, dangerously done." *Gore v. Ohio Dept. of Transp.*, 10th Dist. No. 02AP-996, 2003-Ohio-1648, ¶ 27, citing *Joseph v. Consol. Rail Corp.*, 12th Dist. No. CA87-05-065, 1987 WL 19481, 1987 Ohio App. LEXIS 9435 (Oct. 30, 1987) (recognizing that commercial mowing on an interstate median is not inherently dangerous to third parties but may become dangerous if done using dangerous equipment).

{¶ 79} For guidance on the specific question of whether roofing work employing a torch is inherently dangerous, we find it necessary to expand our search to cases outside Ohio and look to a pair of cases from New York on the subject. These two cases stand for the proposition that while use of a torch on a combustible roof could be inherently dangerous, weighing the particular facts of the situation would be necessary to reach a

definitive conclusion. *Flaherty v. Fox House Condominium*, 299 A.D.2d 448, in passim (N.Y.App.Div.2002); *Digital Prints, Inc. v. Sound Around, Inc.*, 2016 NY Slip Op 30389(U), 2016 N.Y. Misc. LEXIS 729, *48-49 (N.Y.Sup.Ct.2016). Similarly, in a non-roofing case involving use of a torch to solder, a Kansas Court of Appeals found that use of a torch may or may not be inherently dangerous depending on whether it is used near flammable materials such as solvents or gasoline. *Pratt Feeders Inc. v. Haven Erectors, Inc.*, No. 70,219, 1994 Kan. App. Unpub. LEXIS 779, *21 (Kan.Ct.App. July 22, 1994). In the same vein, a Colorado Court of Appeals found that whether use of a cutting torch that started a building fire was inherently dangerous was a factual issue to be resolved by a jury. *Sevit, Inc. v. W. Stock Ctr., Inc.*, 559 P.2d 1118, 1120 (Colo.Ct.App.1976). Like the trial court, we are persuaded that whether the use of a torch in roofing is inherently dangerous to third parties depends on the particular, factual circumstances.

{¶ 80} Here, witnesses were generally in agreement that use of a torch is potentially dangerous. (Tr. at 113, 141-42, 201, 333, 377-78.) But even the expert witness for the plaintiff observed that open-flame torches are sometimes appropriate to use in roofing and they gave somewhat conflicted testimony about the dangers of using an open-flame torch on a wood deck roof (testifying that it would be dangerous and inappropriate but not "inherently dangerous"). (Tr. at 356-57, 370-71, 375-79.) Other witnesses also tempered the general common sense acknowledgment that fire is potentially dangerous. Connell testified that a torch could cause a fire if "used improperly." (Tr. at 98, 113.) Kissling stated that it was appropriate to use a torch to solder on a roof, that the roof would not have caught fire if the torch had been used correctly, and that safe use of a torch depends on using it "properly." (Tr. at 203-04, 235, 242-43.)

{¶ 81} In short, the evidence in this case was in conflict about whether using a torch on this copper job was "inherently dangerous" or whether it was appropriate and only really dangerous if done improperly. Thus, regardless of the *weight* of the evidence, the testimony at trial was *sufficient* to support either a yes or no answer to the interrogatory, "Do you find that the use of an open-flame propane torch in soldering copper to the Mount Air Condominium roof is an inherently dangerous or ultra-hazardous activity?" (Feb. 1, 2018 Jury Interrogs.) This is therefore not a case in which a directed verdict or JNOV would have been appropriate. Drawing all inferences in favor of Capital, we must conclude that the

verdict was sufficiently supported and that the trial court did not err in failing to grant a directed verdict or JNOV to State Farm.

{¶ 82}  State Farm's second assignment of error is overruled.

### 3. State Farm's Third Assignment of Error – Whether the Trial Court Erred in Declining to Find Negligent Hiring Notwithstanding the Jury's Verdict

{¶ 83}  "The common law claim of negligent hiring/retention requires that appellant establish the following elements: (1) existence of an employment relationship; (2) employee's incompetence; (3) employer's actual or constructive knowledge of the alleged incompetence; (4) employer's act or omission causing plaintiff's injuries; and (5) employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries." *Weimerskirch v. Coakley*, 10th Dist. No. 07AP-952, 2008-Ohio-1681, ¶ 13, citing *Peterson v. Buckeye Steel Casings*, 133 Ohio App.3d 715 (10th Dist.1999); *Evans v. Ohio State Univ.*, 112 Ohio App.3d 724, 739 (10th Dist.1996).  State Farm argues that Connell and Taylor had no relevant soldering experience, communicated that fact to Capital and, yet, Capital still unjustifiably hired them and failed to supervise them with the result they performed incompetently and set Mount Air on fire.  (Jan 16, 2019 State Farm's Brief at 33-40.)

{¶ 84}  Yet here again, a review of the transcript shows testimony on some of these elements was rather variable.  For example, with respect to the fifth element involving negligence in hiring, both Kissling and Adkins testified that Taylor was an expert in working with copper and solder, having completed, for example, a detailed and expensive copper fabrication job on a church roof.  (Tr. at 222-23, 339-40.)  The architect, too, testified that Connell's Construction people specialized in sheet metal work and that Taylor, in particular, had done "more than satisfactory" work in soldered copper for him before.  (Tr. at 397-99, 402-03.)  It is true that Taylor's testimony painted a rather more modest picture of his copper working experience and that Connell admitted he had no experience soldering copper in connection with roofing (though he did have some experience soldering copper in other applications).  (Tr. at 97-98, 118-19, 153-54.)  Yet, drawing all inferences in favor of Capital, the jury could have believed Kissling, Adkins, and the architect, while discounting Connell and Taylor's testimony as exaggerated modesty or an attempt to shift

liability to Capital.  Under the circumstances, the jury's verdict was sufficiently supported and JNOV was not appropriate.

{¶ 85}  We overrule State Farm's third assignment of error.

## IV.  CONCLUSION

{¶ 86}  Because genuine issues of material fact existed in the summary judgment record as to elements of State Farm's vicarious liability claim, we reverse the grant of summary judgment in favor of State Farm on that claim.  However, finding no other genuine issues of material fact, we otherwise affirm the grant of summary judgment in favor of State Farm.  We, therefore, sustain Capital's second assignment of error, overrule its third and fourth assignments of error, and we find that its first assignment of error is moot.  And accordingly, under App.R. 12(A)(1)(a), we exercise our jurisdiction to modify the August 15, 2018 judgment entry granting damages in favor of State Farm against Capital to reflect that such damages are solely on the breach of contract claim.

{¶ 87}  We also find that the evidence presented at trial was sufficient for the jury to find that using an open-flame torch to solder copper was not inherently dangerous under the circumstances here, that Capital did not negligently hire or supervise Connell's Construction, and did not reserve the right to maintain control over the manner and means by which Connell's Construction worked.  Accordingly, State Farm was not entitled to a directed verdict or JNOV.  Each of its three assignments of error are overruled and the portion of the August 15, 2018 judgment entry memorializing the jury's verdict is affirmed.

*Judgment modified and affirmed.*

SADLER, P.J., and NELSON, J., concur.

———————————